Marshall, C. J.,
concurring. Eleven separate and distinct proceedings in error have been heard in this court upon review of a single order of the Public Utilities Commission of Ohio, made March 10,. 1921, denying .rehearing of an order made March 8, 1921, wherein the commission approved new schedules of rates, charges and practices filed with the commission under date of June 25, 1920, by The Cincinnati & Suburban Bell *183 Telephone Company, designated “P. U. C. O. No. 2,” containing three sections designated as “Section 1, Local Exchange Tariff,” “Section 2, General Exhange Tariff,” and “Section 3, Toll Tariff,” said schedules to become effective August 21, 1920.
Prior to that date the Telephone Company served the city of Cincinnati and its suburbs, including a number of separate villages and certain rural territory, as a single exchange area known as the Cincinnati Metropolitan District, and throughout such entire area the schedules of rates, charges and practices were entirely uniform.
Under the new schedules the metropolitan district is divided into nine separate and distinct exchange areas, of which the larger portion of the city of Cincinnati is one, known as the Cincinnati Exchange Area, and a number of exchanges among which the schedules provide free call service, which area includes all of the city of Cincinnati, except Mt. Washington on the east, and Delhi, Fernbank and Sayler Park, on the west, and also includes the cities of Nor-wood and St. Bernard which, although independent municipalities, are entirely surrounded and therefore included within the municipal boundaries of Cincinnati; and the Cincinnati exchange area also includes Kennedy Heights, Wyoming, Loekland, Beading and Cheviot, other independent municipalities just outside of the political boundaries of Cincinnati. Although it is not material to this controversy, the Cincinnati exchange area also includes the northern half of the counties of Campbell and Kenton in the state of Kentucky, which comprise the cities of Newport, Covington, and perhaps other cities and villages.
*184 The Cincinnati exchange area, not including the territory across the Ohio river in the state of Kentucky, has approximately 83,000 telephone subscribers, and the other eight exchanges and the number of telephone subscribers in each, are as follows:
Mt. Washington Exchange Area 265 subscribers
Cleves Exchange Area 293
Delhi Exchange Area 400
Glendale Exchange Area 594
Madeira Exchange Area 327
Terrace Park Exchange Area 168
Mt. Healthy Exchange Area 620
Ash Exchange Area 427
Of the eight suburban exchanges, the smallest serves only 168 subscribers and the largest 620 subscribers. The schedules provide a very complicated system of rates, tolls, charges and rentals for the Cincinnati area, which are somewhat larger than the same class of rates, tolls, charges and rentals' for the suburban areas, and while there is free call service within the limits of each area, there is a toll charge of 10 cents per call on all calls beyond the boundary of each area throughout all the separate exchange areas covered by the schedules.
Mt. Washington, -within the eastern limits of the city of Cincinnati, and Delhi, Fembank and Sayler Park, within the western limits of the city, have been within the political boundaries of the municipality for many years and have always been furnished telephone service impartially with all' other portions of the city heretofore. Mt. Washington has only 132 subscribers within the village and the village is now joined with certain rural area within which are 133 additional subscribers. Delhi, Fern- *185 bank and Sayler Park have a total of 160 subscribers and those villages are now joined with certain rural area containing 240 additional subscribers. All of those separated communities within the political boundaries of the city complain of discrimina tion on the ground that they have nothing in common with the rural territory to which they have been joined for telephone service, and also claim that there is a community of interest between them and the remainder of the city of Cincinnati and urge that the schedules are unreasonable and unlawful, not only on social and commercial grounds, but also on political grounds.
The people of Glendale, Madeira, Indian Hill, Terrace Park, Cleves, North Bend, Addyston, Mt. Healthy, and Sharonville, urge that the new schedules constitute a discrimination against them, on the ground that they are denied free call service outside the limits of their respective exchanges and that they are improperly joined with small rural communities but that on the contrary they are a part of the social and commercial life of the city itself, and that more than 90 per cent, of the people of those respective communities have their places of business or employment within the city itself and that they have very little occasion to have telephone conversations within the limits of their respective communities, but that on the contrary the larger number of calls are to and from the city of Cincinnati. It is shown that one and all of these communities are suburban residential additions to the city of Cincinnati and that they have no separate business life or separate social life, neither do they have stores other than small grocery stores, drugstores, and *186 other like stores for providing the more immediate necessities of life. Notwithstanding a slightly lower rental is charged in the suburban exchanges, it is claimed that by reason of the toll charge of 10 cents per call beyond the boundaries of each exchange, and by reason of the community of interest lying between the suburban communities and the city itself, the inhabitants of those respective communities are put to the necessity either of being deprived of much of the service they enjoyed before or submitting to toll charges which will run far in excess of their telephone expense under the former system. It is pointed out that a certain class of residence subscribers within the city, having 92,000 connections, pays $3.25 per month, while subscribers in Terrace Park pay $2.25 per month for the same service, having only 168 connections.
These are the two extremes, but the condition of the other suburban exchanges is only slightly better. It is further pointed out that the charges are not based upon “length of haul,” because in some instances within the old metropolitan district there is under the new schedule free call service over a distance of approximately 15 miles, and in other instances toll is charged where the distance is 5 miles or less. It is therefore claimed that the new system is not a zoning system based upon distance and cost of transmission, but that the subdivision of the former district has been made into suburban areas in an arbitrary maimer which does not logically divide the territory into groups where there is the same community or neighborhood interest.
It was stated by counsel for the telephone company at the hearing before the commission that “the *187 company was guided in fixing and determining the source and localities by the community of interest,” and the same reason was given by the vice-president of the company during his examination. Little, if any testimony, however, was tendered to show that the social and commercial interests of the separate exchange areas were in any sense within the boundaries of those areas, but on the other hand the inhabitants of many of those areas offered abundant evidence that their community of interest was with the city of Cincinnati.
It was further announced by counsel for the utility that certain subscribers in the suburban districts were grossly abusing the service under the former schedules by making an excessive number of calls, thereby burdening the cables to the suburban communities and interfering with those subscribers who made a more conservative use of the telephone. It was intended to place a check upon such excessive use by making a toll charge thereby compelling those who made the larger use of the phone in the suburban communities to pay the larger share of the revenue. A list of the excessive users was furnished at the hearing, there being 50 names in the list throughout the entire suburban areas, which constitute less than one-sixtieth of the entire number of subscribers, and it is found that there was an average of 111 calls per month by such excessive users, and the list further discloses that of the entire number there were only four residence subscribers and the other forty-six were apparently manufacturers, merchants, hospitals, and other enterprises rendering service to the public. Twenty-three of the number had made less than 100 calls per month.
*188 No similar data was furnished concerning the use of the phones within the Cincinnati exchange area, neither does it appear that the conditions in the suburban areas were unusual in this respect. It was, however, testified by the vice-president of the company that the average number of calls per line in the city approximates six calls per day, showing that the average number of calls on all lines is sixty per cent, in excess of the average number of calls of those in the suburban areas who are classified as excessive users.
In some of the suburban areas the sentiment of the people was ascertained by means of questionnaires, which indicated that the great majority of the people throughout the suburban areas are dissatisfied with the change and prefer to pay the same rate as the subscribers within the Cincinnati exchange area for the same service, and state that they will be satisfied with whatever rate is established by the commission governing each class of service, provided such rates are made uniform throughout the territory of the old metropolitan district. "While testimony was not taken covering each suburban area, it seems to have been conceded that the testimony from all of the suburban areas would have been the same as those covered by the testimony, and further examination was by stipulation eliminated on that theory.
It was announced as one of the purposes of the telephone company in segregating the suburban areas to compel the suburban communities to pay their more reasonable share of the cost of the service, and thereby to protect the large number of subscribers within the Cincinnati exchange area from *189 inequalities and unjust burdens. It was, however, stated by the city solicitor of the city of Cincinnati, during the hearing, that he represented the city and would take the responsibility of stating that the people of the city wanted the old metropolitan district to remain as it formerly existed, and “that the rates be distributed over the entire metropolitan district.” To this Mr. Bettman, representing all the suburban communities, rejoined: “Yes, we want the old regime to remain the same.” John W. Galvin, the mayor of the city, testifying as a witness, objected to a subdivision of the city and its suburbs into separate exchange áreas, and urged that the entire territory within the range of a community of interest be served without toll charges among themselves, and that if to do so necessitated an increase in rates, it should be worked out through the entire metropolitan district. The city council, by resolution, had authorized the city solicitor to represent the city and “to take all steps that he may deem necessary, on behalf of the city of Cincinnati, to safeguard the interests of the telephone subscribers of the city of Cincinnati.” The president of the chamber of commerce of the city of Cincinnati was also a witness. It appears, therefore, that all interests, official, commercial and private, within the city of Cincinnati and throughout the suburban districts, are of one mind in wanting the re-establishment of the old metropolitan district and the elimination of tolls. It further appears that not a single subscriber to the telephone service throughout the entire district has appeared as a witness or asked for the subdivision, and not a single witness, outside ef the vice-president of the company and the ex *190 pert for the commission, has defended the subdivision.
This statement has so far dealt with the matter of discrimination in service. The complaint filed by the city of Cincinnati further complains that the rate and charges are exorbitant, prohibitive and contrary to law. The application for rehearing alleges that the commission approved the increased rates as contained in Schedule No. 2 without a legal valuation of the property of the, company used and useful for the convenience of the public, and in deciding that the telephone company is entitled to a return upon that portion of its property used and useful which is represented by additions, extensions and betterments to its plant and property constructed out of earnings set aside by said company from year to year for depreciation, and further, that the commission decided that the telephone company is entitled to a rate of return upon additions, extensions and betterments constructed out of its “corporate surplus unappropriated.” The solicitor also alleges, in the application for rehearing, the same grounds of discrimination in service urged by counsel for the inhabitants in the suburban areas.
In support of its claim for increased rates and increased revenues, the telephone company offered evidence of the value of its property used and useful, as follows :
Reproduction value, less 8 per cent.
depreciation $17,938,974.00
Tax value 13,806,646.00
•Valuation made by Public Utilities
Commission, less 8 per cent, depreciation 14,836,591.61
*191 The financial statement of the company, as of December 31,1920, shows that the company had a common capital stock of $11,065,500; total reserves for depreciation, $3,486,996.86; corporate surplus unappropriated, $520,173.10.
The company has paid dividends on its capital stock as follows:
1910 8 %
1911 8 %
1912 to 1917, inclusive 10 %
1918 20%%
1919 and 1920 8 %
It should be stated that the dividend paid in 1918 was not all paid out of earnings for the previous year.
No valuation was ordered to be made by the commission pursuant to the provisions of Sections 499-9 and 499-10, General Code, but the valuation upon which the commission based its order was pursuant to figures furnished by the company and verified in some manner by an engineer in the service of the commission.
In the report of Thomas E. Green, telephone expert, which is a part of the record in this case, it is stated that his report is not a statutory valuation, but that he used “the plant measurements which were compiled by the Company for taxing purposes, and which we have checked to our satisfaction, and to those measurements applied the unit costs of our Department, which are average costs over a period of six years.” He arrives at a reproduction value of $16,066,331.93, and a present value of $14,836,-591.61, indicating that the accrued depreciation is approximately 7.7 per cent, of the reproduction *192 value. He expresses the opinion that the rates established under the new schedule are not excessive.
After reviewing the suburban situation he compares the suburban situation in Cincinnati with the suburban situation in Cleveland, where toll charges are in effect, and therefore recommends that the establishment of independent suburban areas with toll charges between exchanges be approved. He finds that the Mt. Washington area is a community in itself, but there is testimony of several witnesses to the contrary. The cross-examination of Mr. Green developed that his examination of the property of the telephone company was rather cursory, and that, as hereafter shown in this opinion, his recommendations were evidently based upon legal propositions which are contrary to the statutes and to the holdings of this court. It is evident from the record that all repairs have been paid for out of current revenues as a part of the expense of operation; and it further appears that the plant and equipment is in such physical condition as to have a value equal to 92.3 per cent, of its reproduction value. It appears that the plant and equipment is 100 per cent, efficient, because it seems to be admitted throughout the record that there has been no cause for complaint of the service rendered. While the accrued depreciation of the . plant and equipment seems to be only 7.7 per cent, of its reproduction value, the company has found it possible, during the years 1910 to 1920, inclusive, to accumulate a depreciation reserve amounting to approximately 30 per cent, of its entire outstanding capital.
It is claimed by the telephone company that its surplus facilities are practically exhausted, and that *193 it will be necessary, in the immediate future, to expend approximately $5,000,000 for switchboard, cables and other equipment, but no detailed list or estimated cost of the same appears in the record further than the mere statement that these matters have formerly been submitted to the commission.
While certain claims are made by Mt. Washington, Delhi, Sayler Park and Pemhank that they are entitled to the same service as other parts of the city of Cincinnati by reason of being included within the same political area, such claims do not seem to be based upon any ordinance of the city to which the telephone company has been a party. At the time the city acquired the right to establish underground conduits it seems there was no stipulation as to rates or service.
In reviewing the order of the public utilities commission this court is deprived of the benefit of any findings of fact. It is also deprived of any conclusions of law deduced therefrom and can only surmise the reasons which led the commission to make the order of March 8, 1921. The order does recite that the commission “entered upon a hearing and investigation to determine the propriety of said proposed increased and new rates and toll charges rules and regulations.” It further recites that its determination was made upon the evidence introduced, “including the report of this Commission’s Telephone Expert of his investigation of the company’s exhibits and the evidence theretofore offered at sessions of the hearing herein, and his calculations demonstrating that the revenues of the respondent under such proposed rates, toll charges and rules and regulations will not produce an unrea *194 sonable return upon the respondent’s property investment in said county,” etc. It does appear, therefore, that the commission based its order approving the schedule of rates upon the “property investment in said county. ’ ’ And it further appears that the commission substantially followed the report of the commission’s telephone expert of his investigation of the company’s exhibits and his calculations made therefrom.
The legal questions arising out of this controversy involve the two most important subjects over which jurisdiction has been conferred upon the public utilities commission, to-wit: rates and service. The city of Cincinnati is primarily concerned with the subject of rates, but incidentally concerned with the matter of obtaining impartial service for all of the inhabitants of the city and those suburban communities tributary to the city. The suburban communities appearing in ten of the eleven petitions in error in this joint controversy are primarily concerned with the subject of service, but they are also incidentally interested jointly with the interests of the metropolitan center in the subject of rates.
It should be stated at the outset of this discussion that it is not the province of this court to fix a rate or to stipulate the kind and character of service to be rendered. It does not have original jurisdiction, but can only exercise its revisory jurisdiction over the orders of the commission, and upon review of such orders determine whether in each instance they are unlawful and unreasonable, and, therefore, either affirm, reverse or modify the order of the commission, and upon the imperfect state of this record must refrain, from expressing an opinion as to what *195 would be a proper rate or an appropriate kind and character of service.
The subjects of rates and service and the legal conclusions arising from each are governed by separate principles and based upon separate facts, and must, therefore, be separately considered. It seems more logical to first consider the question of rates.
It has already been observed that the commission’s order impliedly, if not expressly, purposes to provide a reasonable rate upon the property investment in the county. It does not, however, appear from the order of the commission:
1. "What is the value of the property used and useful in the county of Hamilton;
2. What rate of return a telephone company is entitled to earn upon its property used and useful;
3. Whether the depreciation reserve of $3,486,-996.86 was included in the “property investments” which the commission had in mind in determining that the utility would earn a proper rate of return.
Although the commission refers to the property investment in the county, the record does not disclose the valuation of such property investment found by the commission and it is very clear from the record that the commission did not make any such valuation as defined by Sections 499-9 and 499-10 of the General Code, as a preliminary to fixing a rate where the rate is intended to depend upon the value of property used and useful for the service and convenience of the public. The language of Section 499-8 is not peremptory in requiring a valuation to be made, but if the commission in fact bases its order upon a valuation of property it must necessarily follow the method provided for determin *196 ing values set out in the two succeeding sections. The absence of a statutory valuation and the attitude of the commission relating thereto is indicated by the following colloquy between counsel for the utility and the chairman of the commission as follows :
“Mr. Heintzman: Then I want to make this supplemental statement, that if this Commission is going to make a valuation of all the property, we want to be permitted to file the proper prayer and ask for a rate to be fixed according to law; in other words, to be based upon $19,000,000 or more of property rather than what we are submitting.
“Chairman Marshall: The Commission is going to refer this case now, since the testimony is all in, to our telephone department, with instructions to make any investigation and go over the matter and report to this Commission, and then we will serve copies of the report upon both parties and all parties, and if you want to be further heard, we will grant it.”
The cross-examination of Mr. Green, the telephone expert, throws further light upon what was in fact done. In response to a question propounded by counsel for the city, Mr. Green answered: “That is what I was sent there for was to set a high spot valuation on the property.” In further explanation of that statement he indicated that he took a general survey of the situation and then came to a conclusion from his experience in the department as to what the property is probably worth. If it is assumed that the commission adopted the recommendations of the report of Mr. Green, that report shows that no separate inventory was taken but that the entire property of the company in the state of Ohio *197 as inventoried by the company was taken as a basis and then by some method not disclosed the property in Butler and Clermont counties was subtracted therefrom. Inasmuch as a different rate was established for the eight suburban exchange areas from that established for the metropolitan center, and yet no separate valuation was made of property used and useful within those suburban areas, it does not appear in what manner property investment was utilized in determining the propriety of rates in the suburban exchange areas. In the cross-examination of Mr. Green it developed that he had arrived at a division of the property on a percentage basis taking into consideration the number of the telephone stations in Hamilton county and determining what ratio they bore to the entire number of stations in all territory served by the company. It does not appear what percentage was in the other two counties in Ohio, nor what percentage was in Campbell and Kenton counties in the state of Kentucky. Belianee was made upon the plant measurements made by the company and the number of stations in Hamilton county, without regard to construction costs of the equipment located in the different counties. While this court cannot positively state that this method resulted in unfairness, yet it must be admitted that very much has been left to conjecture, and the question arises upon this record whether the commission based its order upon a statutory valuation or expert estimates made upon the basis of the utility’s valuations and plant measurements. Even conceding that Section 499-8, General Code, is only directory, lodging a discretion in the commission as to whether or not a valuation shall be made, it <Ioe9 *198 not follow that the commission may merely make out an estimate. It is undisputed in this record that the total outstanding capital stock of the company is $11,065,500 and that this represents all of the capital assets invested in this company. The balance sheet of the company at the end of the year 1920 shows reserves and surplus in excess of four million dollars. It is clear that such reserves and surplus represent accumulated earnings, all of-which are invested in the business and form the basis of increased earnings out of which dividends have been earned for the capital stock.
We are thus brought to a consideration of the next question as to whether the telephone company is entitled to add its depreciation reserve account of approximately three and one-half million dollars to its outstanding capital stock as a basis for rates.
A depreciation account is not only a sound business principle but it also has the sanction of the statutes, as expressed in Sections 614-49 and 614-50, General - Code. The former section provides that every utility shall carry a proper and adequate depreciation or deferred maintenance account and that the commission shall ascertain, determine and prescribe what are proper and adequate charges for depreciation of the several classes of property for each utility. That section also clearly defines, depreciation in the following language: “The charge for depreciation shall be such as will provide the amount required over cmd above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry.” It is not a question of proper accounting or sound business principles. *199 Neither can the decisions of the courts either of the state of Ohio or other states or the federal courts add to or take from the very clear language above quoted. That language contemplates that the property and equipment of each utility shall be maintained and its ordinary current repairs made and womout minor parts of equipment renewed out of current earnings and the same charged to expense of operation. It further contemplates that over ¿nd above such expense of maintenance the company shall set aside such reserve as will at all times fairly equal the difference between the value of the property as it stands and such value as it would have in a state of efficiency corresponding to the progress of the art or industry. Such reserve fund, commonly called a depreciation reserve, is for the purpose of providing for extraordinary repairs, such as restoring deteriorated property and equipment to efficient condition, substituting new parts for old parts of continuous structures, and restoring property and equipment damaged by storms, floods, fire and other casualties.
The annual sums contributed to such reserve fund out of current earnings are also charged to operating expenses, and when such extraordinary repairs, substitutions and restorations are made, the cost of same should be charged against such reserve. While the statute above quoted does not specifically so provide, the authorities recognize the expediency and propriety of such reserve having a safety margin to cover possible and probable contingencies and casualties. There can be no great mystery about the legislative intent in the employment of the language above quoted. It is not a question of present *200 worth of the property in its entirety as compared with its worth at a former period, because extensive additions may have been made and paid for either out of new capital or out of surplus earnings. It is rather a question of the physical condition of the property as it stands as compared with the physical condition of equipment designed to render a like service “in a state of efficiency corresponding to the progress of the art or industry,” or, in other words, the latest improved equipment for the purpose to be served. Different utilities must necessarily have their depreciation accounts on different bases. For instance a natural gas company depending upon nature for its product and knowing that that product will sooner or later become exhausted must amortize its equipment by the time the product is expected to become exhausted. A telephone company, on the other hand, is not dependent upon nature but manufactures its product and presumably will have a perpetual and a progressive existence.
As to what may be a proper estimate of accrued depreciation depends not only upon the physical condition of the equipment of each particular utility, hut also upon the character of the utility itself. The estimates of the engineer employed by the commission and the vice-president of the Telephone Company are respectively 7.7% and 8%, but this of oourse does not take into account a safety margin for contingencies and casualties.
Even if it be assumed that the telephone company has properly classified its operating expenses and in whatever manner repairs, renewals and betterments have been paid for, the fact remains that the depreciation reserve has reached enormous pro *201 portions, and inasmuch as it seems to be conceded on all sides that the company has given satisfactory service, it follows that the plant and equipment of the company must be sufficiently modem and in sufficiently good physical condition to justify the conclusion of the vice-president of the company and the telephone expert of the commission that an 8 per cent, accrued depreciation is just and reasonable.
While it is not shown by the testimony and exhibits on file in this case just how the accounting has been done, it is only fair to assume that the telephone company has followed the instructions given by the interstate commerce commission to govern the accounting department of utilities engaged in interstate commerce. It is assumed therefore that the addition which has been made from year to year to the “reserve for accrued depreciation” has been arrived at by passing a credit to this account annually of 5 per cent, of the average value of the property used and useful for the year preceding, and that from such percentage there is deducted the cost of certain repairs and renewals to the equipment during the year preceding.
We have already observed that it is a sound and approved policy to permit the depreciation reserve account to grow beyond the point of merely covering the accrued or actual depreciation, and yet it must be recognized that such excess is in the nature of an unappropriated surplus, and we are of the opinion that in this case the accumulated reserve has been permitted to reach unreasonable proportions.
With uncontradicted testimony of accumulated depreciation of not more than 8 per cent., and an ac: knowledged accumulated depreciation reserve of ap *202 proximately 30 per cent., the situation calls for the earnest consideration of this court. The annual provision for depreciation is a replacement of capital in respect to past capital outlay expired in the process of carrying on the business.
It is not intended that depreciation reserve as such should provide for the growth of the plant and for such additional equipment as may be necessary to keep step with the needs of a rapidly growing city. It is true that such a fund belongs to the company, but having been created out of surplus earnings it should not be permitted to do double duty by being made the basis for additional earnings for distribution to stockhplders. This is true upon principle, because a public utility is only entitled to earn a fair return upon the property investment and if in addition to such fair return it is able to accumulate a large surplus, it is an indication that the company was making more than a justifiable return and having accumulated a large depreciation reserve account and a large surplus under an unjustifiable rate, it is only augmenting the evil to employ the surplus thus obtained as the basis for further increased returns. It is urged, however, that the legislature has sanctioned adding the depreciation or deferred maintenance account to the invested capital, and Section 614-50 is pointed to in support of this contention:
“Sec. 614-50. The moneys for depreciation charges thus provided for shall be set aside out of the earnings and carried as a depreciation fund. The moneys in such fund may be expended in new construction, extensions or additions to the property of the public utility, or invested, and if invested, the *203 income from the investment shall also be carried in the depreciation fund. Such fund and the proceeds thereof, may be used for the purpose of renewing, restoring, replacing or substituting depreciated property in order to keep the plant in a state of efficiency. Such fund and the proceeds or income therefrom shall be used for no purpose other than as provided in this section, except upon the approval of the commission.”
It will be seen that while the legislature has directly authorized the employment of the depreciation. fund in new construction, extensions or additions, it also authorizes the investment of such fund and if invested the income shall continue to be carried in the depreciation fund, and shall be used for no other purpose.
It will further be seen that the above quoted section authorizes the employment of the fund in renewing, restoring, replacing or substituting depreciated property in order to keep the plant in a state of efficiency. In so doing the company would only do that which it would be its duty to do and the more nearly the plant is maintained in a state of efficiency the less accrued depreciation would exist. Renewals, repairs, replacements and extensions could not be appraised or valued, except in the sense that the equipment itself would bear a higher value by reason of the fund being so used. Inasmuch as the fund itself is intended to represent the difference between the plant in its existing condition and the plant in a state of efficiency, it seems highly proper that the fund should be thus employed, and if it were possible to bring the property and equipment “in a state of efficiency corresponding to the progress of *204 the art or industry” there would no longer be any necessity whatever for the depreciation account. Whenever the fund has reached such proportions as to equal the accrued depreciation, plus a fair safety margin, it should not be further increased from year to year in case of a telephone utility which is being continuously maintained in a state of efficiency out of current earnings. Neither should such reserve be added to the capital account or appraised as a part of the property which is the basis of rates charged for service.
This is not an entirely new question in Ohio, because in the ease of Pollitz v. Pub. Util. Comm., 97 Ohio St., 191, this court in considering the question whether under the provisions of Section 614-53 the public utility commission is empowered to permit the capitalization of replacements of equipment or any physical property, held that such replacements may not be capitalized but must be kept up from income. If a depreciation or deferred maintenance account may not be employed as a basis for the additional issue of securities, by the same course of reasoning it may not be employed as the basis for increased rates.
A case directly involving the identical points under discussion is Rd. Comm. of Louisiana v. Cumberland Tel. & Teleg. Co., 212 U. S., 414. From the syllabus of that case we quote: “Where a public service corporation raises more money in a particular year than required for actual depreciation it cannot carry the excess to capital for the purpose of estimating the amount on which it is entitled to pay dividends in determining whether a rate is unconstitutional as confiscatory, and the onus of showing that this has *205 not been done is on complainant where the books ■show that such an excess has been collected.”
It is true that in that case the court reserved the question whether the utility would be entitled to dividends on such excess if invested in extensions and additions, but we are of the opinion that if the court in that case had been construing Section 614-50 that question would not have been reserved. It is true that it has been decided that for the purpose of fixing rates the value of property employed should be determined as of the time the inquiry is made, and that generally the corporation is entitled to the benefit of increased value since acquisition, but this declaration covers those cases where the property itself has appreciated in value and not those cases where additions and extensions have been constructed out of surplus earnings resulting from an excessive rate.
In the Minnesota Rate Cases, 230 U. S., 352, it was decided that the utility is entitled to a just compensation and that the same should be a fair return upon the reasonable value of the property at the time, and further that such reasonable value is not determined by the actual investment. It is pointéd out that if the investment has been reckless or improvident and loss thereby sustained the community does, not underwrite such loss, and that on the other hand if the company has been careful in its investments, and its construction of equipment and if for that reason the property appreciates in value and is worth more than its cost, the company is entitled to the benefit thereof. The principles declared in that case have been universally recognized as sound, but have never been applied to depreciation reserves. The exhaus *206 tive briefs of counsel fail to point out any reported case where depreciation reserves have been so employed.
Another reason assigned by the telephone company as the basis of the increased rates is that the company has practically exhausted its surplus equipment and has reached the point where it has become necessary >to make large expenditures for new equipment, involving approximately five million dollars. It was stated that this need had already been explained to the commission and that the commission had approved the same. If so, it does not appear that it is properly a part of this record. The company is able to furnish satisfactory service to its present subscribers with its present equipment. Any extensive additions to such equipment must necessarily be designed to take care of additional business, and the telephone company being already well established it must be assumed that such additional equipment will be so employed as to produce the same rate of net earnings as its present equipment. The former rates, charges and rental applied to the new equipment and the increased net earnings resulting therefrom should present no financial problem. At any rate, no reason has been assigned and the commission is not justified in inferring that the additional wires, cables, poles, conduits and switchboards will not be as efficient and as profitable as the equipment heretofore employed. It would seem more reasonable for the company to install the additional equipment and if experience shows that it is necessary to have an increased rate in order to pay a proper return upon such additional equipment, such an increased rate can be approved, based upon *207 experience, but such, a rate should not be allowed based merely upon prophecy.
Much has been said about necessity for an increased rate because of the increased cost of labor and materials. The answer to that is that the new schedules were published at a time when labor and materials were at the peak, and the company having weathered the storm during the period of high costs and having been able to pay its accustomed dividends through all that period, being dividends largely in excess of the dividends usually paid by utilities, it can hardly be said that the company will not be able to continue to make a fair return.
It was further claimed that during the period of the war heavy drafts were being drawn upon the surplus equipment and that the point has now been reached when there must be a large expansion. This claim is not impressive in the face of the fact that for the period of ten years from 1910 to 1920 the average dividends paid upon the capital stock was 11%% per annum.
This brings us face to face with the next question which must receive consideration, to-wit: what rate of return a telephone company is entitled to earn upon its property used and useful. This is a question which courts and commissions have not definitely determined, and manifestly the courts should not definitely determine the rate of dividends which should be paid by any utility company to its stockholders, because there must necessarily be some premium placed upon thrift, economical administration and business management, and there must also be some penalty placed upon bad management and wastefulness. It appears, from this recbrd, that *208 the Cincinnati & Suburban Telephone Company has always given good service, and it is equally apparent from this record that they must always have managed the business in a business-like and economical manner. It must be admitted, on the other hand, that the dividends which have been paid during the past eleven years have been more than have usually been paid by utilities of the same general character as telephones. Naturally there is a difference between utilities. A natural gas company must amortize its capital, because the product will eventually fail. A telephone company need not do so, because it is unlikely that telephone service will ever be discontinued or replaced by any other utility which will dispense with poles, wires, cables, conduits, switchboards and operators. Any telephone company which has been able to keep its equipment in a high state of efficiency, set apart large depreciation reserve and a large unappropriated surplus, and at the same time pay such dividends as have been paid by this company, must be admitted to stand in a much more favored situation than the general average of utilities. By the provisions of Section 614-2, General Code, a telephone company is declared to be a common carrier. If by that declaration some analogy is created between a telephone company and a railroad company, it is proper to call attention to the federal transportation act of 1920, which declares that for the two years beginnig March 1, 1920, the interstate commerce commission should take as a fair return upon property of railroads a sum equal to 5% per cent, thereof, with certain other provisions for distribution of any amount in excess of 5% per cent. This law, of course, does not in any sense con *209 trol the present controversy, hut it is pointed to as an indication. During federal control the government guaranteed only 6 per cent, return upon railroad properties. Telephone companies are not subjected to unusual hazards, and they are permitted to enjoy a practical monopoly, and rates of return must therefore be on a conservative basis. These very general observations on the subject of rates are in harmony with the declarations of courts and comissions generally, and we believe them to be as definite as they can properly be made.
The conclusions 1 have reached on the question of rates are as follows:
It is not mandatory upon the commission to make a valuation as a preliminary to approving or rejecting a rate, but if any valuation is made it must necessarily be made in conformity to the provisions of the General Code as declared in Sections 499-8, 499-9 and 499-10.
No part of the depreciation and deferred maintenance account and no part of the unappropriated surplus which have been accumulated at the same time that fair dividends have been paid upon the capital stock of the company, and which have been accumulated as a result of á rate which has been more than fairly remunerative and which has, therefore, produced more than a fair rate of return upon the property used and useful, should be capitalized or made the basis of increased earnings to the company and, therefore, increased dividends to stockholders.
Based upon the foregoing statement of facts and the foregoing declarations of principles, it must be declared that the Cincinnati .& Suburban Tele *210 phone Company has not sustained the burden of proof imposed upon it by Section 614-20, General Code, known as the Robinson act, and that the order of the commission in this respect is unreasonable and unlawful.
It remains to discuss the complaints filed by the people of the various suburban communities surrounding the city of Cincinnati and those portions of the city itself which have been placed in separate exchange areas and, therefore, compelled to pay toll service in communicating with the metropolitan center.
A reading of the order made by the commission in this case discloses no mention of the matter of service, and no findings whatever relative to the complaints of the suburban residents, the entire matter being disposed of by general approval of the schedules wherein the separation of the old Cincinnati metropolitan district was made into separate exchange areas. The company seeks to justify its action on the ground that these several communities have their community of interest within themselves and not in common with the city of Cincinnati, and that they are given cheaper rental service, and that except for communications with persons outside of their own areas, for which a toll charge is made, they are benefited by the change. The new plan is further sought to be justified on the ground that there are certain persons and firms in the suburban areas who abuse the service by making an excessive number of calls, thereby not only burdening the cables, but depriving other conservative users of the use of the lines. It is frankly admitted by the telephone company that the proper method of establishing ex *211 changes is by determination of the community of interest. This theory is fully approved not only by the city authoi'ities, but by the inhabitants of the suburban areas, and it therefore becomes merely a question of fact as to whether the community of interest lies within the separate exchanges'or whether there is a general community of interest between the city itself and the suburban areas. The testimony on this point is overwhelmingly in favor of the general community of interest. Unless, therefore, there is some insurmountable barrier against the re-establishment of the old metropolitan district, some physical reason why the former conditions can not be restored, the mere matter of casting some additional burdens upon the people of the city of Cincinnati which should more properly be borne by the people of the suburban areas, because of their receiving the benefit of the longer haul, should not be permitted to stand in the way. It is not difficult to arrive at this conclusion, because the city of Cincinnati, speaking through the mayor of the city, the president of the chamber of commerce, the city council and the city solicitor, has requested the restoration of the former conditions, and has stated that if it is shown to be necessary to make an increase of rates generally throughout the entire district, it is willing. that the increase be allowed. The record shows that the company has been receiving less revenue from the suburban districts since the change, and the suburban dwellers have therefore been charged less for telephone service. But it seems reasonably clear that this is because they have been denying themselves the service since the toll charges have been in effect. The result seems to *212 be that the company is not only receiving less revenue, but the people are receiving little or no service. The company must necessarily maintain its equipment in a proper state of efficiency, and the equipment should therefore be so employed as to produce more instead of less revenue. There are approximately 3,000 subscribers all told in the suburban areas, and a horizontal rental charge throughout the entire metropolitan district which would slightly favor 3,000 subscribers could not fall very heavily upon the 83,000 subscribers of the city proper.
Another reason assigned for establishing separate exchange areas is that a few, a comparatively small number, of subscribers make excessive use of the lines. It does not square with innate justice to visit punishment upon an overwhelming majority in order to reach and correct an acknowledged evil being practiced by a small minority. We are not unmindful that it was testified in this case that no invention has been discovered which will correct the evil of excessive use, except the toll system. The insurmountable objection to that remedy is that it punishes non-offenders. The telephone is not strictly a commercial proposition. If it were, the toll system would be above criticism. The telephone is a social utility, a household convenience, which figures largely in domestic economy, increasing the happiness! and promoting the general welfare of the home. This fact is given full recognition in the general scheme of making a lower rate for family service than for business service. No regulations, restrictions or practices should be indulged or encouraged which will run counter to these principles. True, there is *213 a certain sphere of rental service in these areas, but it is so limited and so lacking in community of interest, and so lacking in social unity that a real and ■well-founded complaint is presented. If any of these exchange areas were far removed from a metropolitan center so that such area would fairly include a social center and its boundaries fairly enclose those families which make up the aggregate of the social activities and those vitally necessary business activities which enter into the domestic life, the plan adopted by the telephone company in this case would sound the true doctrine. The real situation, as shown by this record, is so different from that which the officials of the telephone company believed to be true that a return to the old system seems imperative. The company has given a complete list of the excessive users throughout the suburban areas, and it is found that only 50 of the entire 3,000 are so classed, and they average only 111 calls per month. This does not seem to be such an evil as calls for such drastic treatment. It is difficult to believe that the evil of excessive use is confined to small municipalities or suburban communities. It is a fact too well known to require proof that in any city, however large or however small, the greater volume of the use of the telephone is among a comparatively small minority, and that the large majority make a very moderate use of the ’phone. The same comparison could be made within each class of subscribers. Some housewives use the ’phone for purposes of neighborhood gossip and other unprofitable conversation, while others are entirely reasonable and conservative in its use. Some business houses make very little use of the ’phone, while others keep the *214 ’phone in constant nse, yet all pay the -same rate. A measure of justification is found in the fact that many large users are themselves serving the public and the telephone greatly facilitates the service. If no invention other than the toll system has been discovered to prevent abuse of service, it is unfortunate, but such fact does not completely answer these complaints. It has been suggested that if the commission had refused to approve the system of suburban exchange areas it would result in measured service. The plan of cross-examination pursued by counsel for the telephone company followed the general theory of measured service, but it requires no logic to show that the service being rendered to the Cincinnati suburban communities is not measured service. It is, in the clearest sense, a rental service within narrowly restricted areas. As an economic principle measured service is sound when applied to conditions which justify its employment, and it was in fact approved by this court in the case of City of Cleveland v. Public Util. Comm., 102 Ohio St., 341.
The system under consideration has occasionally been referred to as a zoning system, and while the zoning system has been recognized to be sound when based upon distance and cost of transmission, it has never been applied to utilities generally, and the system under consideration in this controversy is certainly not a zoning system, because it seems to bear no direct or uniform relation to length of haul.
In the determination of this branch of the controversy there are certain moral, social and economic problems involved, and while this lawsuit like all others must be decided upon legal prin *215 ciples, yet as in every other lawsuit the duty of the court is to apply existing legal principles to the existing moral, social and economic conditions presented in the facts of the controversy. The rights and duties of the people of the central and closely built up portions of the city of Cincinnati cannot be determined without regard to the rights and duties of the outlying and residence portions, and the same is true as between the people of the city itself and the people of the suburban cities, villages and populous rural communities surrounding the city on the north, east and west. It would be idle to contend that each and all classes and sections of any metropolitan community do not owe relative social and economic obligations to the others, or that any general utility which is as firmly established in the scheme of modem civilization as the telephone can classify its service into different sections and classes against the will of its patrons and thereby raise an artificial barrier which will isolate certain suburban residents from the metropolitan center where their business is located and which center is also the focus of all social activities. Every citizen of the metropolitan community of which the city of Cincinnati is the center contributes toward its existence. The community is the product of the co-ordinated efforts of both city and suburbs and neither can be prosperous or happy unless both shall work for their mutual benefit. Suburban growth should be encouraged because of considerations of health and the advantages to child life, and there is no other single feature of general public utility which figures more largely in the comforts and the safety of suburban life than the telephone. The mere fact that *216 it costs more to transmit telephone messages to the suburbs than it does to transmit a similar message a distance of a few squares from the central switchboard is not a conclusive argument. The United States mails make no discrimination on account of length of haul and it will be found that a pound of second class mail matter can be transmitted from New York to San Francisco for eight cents. The cost of transportation of the same package from New York to Brooklyn would be no less. On the other hand, it would cost to send a pound of the same merchandise from New York to San Francisco by express 64 cents, while the cost of transportation of such package from New York to Brooklyn by express would be only nominal. The answer to this branch of the controversy is easily found in the fact that the entire community is of one mind in wanting uniform rates throughout the old metropolitan district and let the cost of the same fall upon all the inhabitants alike.
Upon the facts relating to the second branch of this controversy and the legal principles pertaining thereto herein declared, I am of the opinion that the service rendered to the people residing in the suburban areas is inadequate and unjustly discriminatory and that taking into consideration the kind and character of service rendered to them, the rate is excessive.
I will state in a general way the following principles which I believe to be applicable to this controversy, believing them to be sound and confidently believing that in due time they will become established as settled law in the matter of rates and service to be rendered by telephone companies.
*217 1. When in the course of a proceeding by the public utilities commission to ascertain the reasonableness and justness of rates and charges for the service, rendered by a public utility the commission determines to ascertain the value of the property of such utility used and useful for the service and convenience of the public, such determination must be made in accordance with the provisions of Section 499-9, General Code, and such value should be ascertained as of the time when the inquiry is made and as a general rule the utility is entitled to the benefit of increased value since acquisition.
2. The property the value of which may be ascertained as a basis for ascertaining proper rates and charges includes only such property as has been purchased or acquired as capital assets and if such property has increased in value since it was acquired the company is entitled to the benefit of such increase.
3. Section 614-49, General Code, requires that every public utility shall carry a proper and adequate depreciation or deferred maintenance account and that “the charge for depreciation shall be such as will provide the amount required over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry.” This provision has no relation to ordinary repairs or minor replacements of parts of equipment, neither is it intended to provide for the growth of the plant or for additional equipment such as may bp necessary to provide the needs of a growing business. It is a replacement of capital in respect to past capital outlay expired in the process of carrying on the business.
*218 4. Section 614-50, General Code, provides that such depreciation or deferred maintenance account may be expended in new construction, extensions or additions to the property of a utility but does not contemplate that such new construction, extensions or additions shall be added to those assets acquired by capital outlay in ascertaining the value of property used and useful, neither does that section contemplate that such depreciation or deferred maintenance account if otherwise invested shall be thus added.
5. A telephone utility may be required to operate a part of its system under a schedule of rates and charges which will not produce a fair return on the portion of its property used in that part of its system, provided the return upon the property as a whole does not thereby render the business as a whole unprofitable.
6. Small municipalities and residence communities forming the suburbs of a large city, the inhabitants of which suburban communities have their social and commercial interests in the metropolitan center, cannot be said to have separate community interests, and where a telephone business has been built up to include such city and its suburbs, with free call service throughout the entire district, the telephone company may not thereafter separate the suburbs into separate exchange areas and make toll charges for calls beyond the boundaries of each exchange area, and to do so amounts to unjust discrimination.
7. Exchange areas should be so arranged by a telephone company as to give free call service to all inhabitants within the radius of general community of interest.
*219 8. Rates should not be increased neither should toll charges be made for the mere purpose of reducing prolonged conversations over telephone lines about unimportant matters.