## RAILROAD COMMISSION OF LOUISIANA *v.* CUMBERLAND TELEPHONE AND TELEGRAPH COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 182. Argued October 20, 21, 1908.—Decided February 23, 1909.

Where diverse citizenship exists complainant may assert in a suit in the Circuit Court of the United States that rates fixed by ordinance are so low as to be confiscatory under the Fourteenth Amendment or unreasonable or unjust under the provisions of state law. Rates fixed by the body having jurisdiction, after investigation based on reports of the corporation rendering the service, are *prima facie* fair and valid and the burden of proof is on the complainant attacking them to show that they are confiscatory or unreasonable.

Where a public service corporation raises more money in a particular year than required for actual depreciation it cannot carry the excess to capital for the purpose of estimating the amount on which it is entitled to pay dividends in determining whether a rate is unconstitutional as confiscatory, and the onus of showing that this has not been done is on complainant where the books show that such an excess has been collected.

*Quære,* and not decided, whether it would be entitled to dividends on such excess if invested in extensions and additions.

While in some businesses where increased demand does not involve a corresponding increase in expense, increased profits may result from decreased rates, this rule does not apply to a business, such as that of a telephone company, where expenses are proportionately increased with increased demand and service.

Although complainant failed to prove its case, the bill will not be dismissed but a new trial ordered, as the rates have been in force and the inquiry can be founded upon their actual effect.

156 Fed. Rep. 823, reversed.

THIS case comes here upon appeal by the railroad commission, which was defendant below, from a decree of the Circuit Court of the United States for the Eastern District of Louisiana, enjoining the enforcement of certain rates prescribed by the

railroad commission of that State, for use by the appellee telephone company therein. The appellant was created under art. 283 of the constitution of the State of Louisiana; and art. 284 of that constitution authorizes it to adopt just and reasonable rates, charges and regulations governing and regulating, among other corporations, those operating the telephone within the State. The commission has the power to examine and compel the attendance of and to swear witnesses, and compel the production of books and papers, to take testimony under commission and to punish for contempt, as fully as provided by law for the District Courts.

Article 285 of the constitution provides that if any corporation subject to the commission is dissatisfied with its decision "fixing or adopting any rate, . . . the corporation thus dissatisfied may file a petition, setting forth the cause of its objection, in a court of competent jurisdiction at the domicil of the commission, against said commission as defendant, and either party to such action may appeal the case to the Supreme Court of the State without regard to the amount involved, . . ."

By art. 286 it is provided, among other things, that "whenever any rate, order, charge, rule or regulation of the commission is contested in court, as provided for in art. 285 of this constitution, no fine or penalty for disobedience thereto, or disregard thereof, shall be incurred until after said contestation shall have been finally decided by the courts, and then only for acts subsequently committed."

Under these provisions of the constitution the railroad commission had been created and was in operation, and on or about August 6, 1906, it established and promulgated certain rates for the complainant to charge for its services within the State of Louisiana, to take effect September 1, 1906. The complainant, immediately after the promulgation of the order and before the time when it was to take effect, applied to the commission for a rehearing before it, which was granted, but no evidence was taken on such rehearing, and the commission subsequently

reaffirmed the order and directed that it should take effect on the twentieth of October, 1906. Thereupon the complainant commenced this suit for the purpose of enjoining the enforcement of the rates established by the order, which is designated as Order No. 552.

In the bill filed by the complainant it was alleged that the complainant was a corporation organized and existing under the laws of the State of Kentucky and a citizen and resident of that State, and that the railroad commission of Louisiana was a corporation organized and existing under the laws of the State of Louisiana and was a resident of that State and of the district in which suit was brought, viz., in the Eastern District of Louisiana, Baton Rouge Division.

It was also alleged that prior to August 6, 1906, the complainant had in force and effect a tariff of rates between points in the State of Louisiana, which had been promulgated and put into effect by the railroad commission of that State; that such rates were entirely fair and reasonable in so far as the public is or was concerned, as under them subscribers were and are able to use said service at a price which did not and does not afford complainant a fair, just and reasonable compensation for its services.

It was also averred that while such rates were in force the commission, without making any investigation and without any evidence in regard to any of the facts necessary to reach a determination, and without any effort to obtain evidence in that direction, made and promulgated, on the sixth of August, 1906, the order known as Order No. 552, by which order it greatly reduced the rates in existence up to that time, and the former rates were thereby changed to the rates specified in the order, which order was to become effective after the first of September, 1906.

The complainant further averred that it had asked for a rehearing, which the commission granted, and thereafter, being still without evidence or investigation justifying the same, the commission reaffirmed the Order No. 552, and declared that

the same should become effective within ten days from the date of the second order, which was dated October 10, 1906.

It was also further averred that the rates which preceded the rates provided for in Order No. 552 were reasonable, just and fair to the public and not in any wise excessive, and under them complainant received for its services only a fair and reasonable return for the services rendered; that under the tariff of rates promulgated and sought to be enforced by the commission under Order No. 552 complainant would be required to render the services therein described at an unreasonable, unjust and unremunerative rate, which would not afford to it a reasonable return for the services rendered, and that it would thereby be deprived of its property without due process of law; that said proposed tariff was unjust, unreasonable in itself, and was not justified by any conditions, either concerning the services in question or by the financial or physical condition of complainant's property or affairs; that the orders of the commission complained of were unjust, unfair and unreasonable and unwarranted, not only with regard to the tariff as a whole, but with regard to each particular rate charged by said tariff; and that the tariff of rates, as a whole and in detail, constituted, for the reasons already set forth, a taking of complainant's property without due process of law and without compensation being previously made, contrary to and in violation of § 1, Art. XIV, of the Amendments of the Constitution of the United States and in violation of certain (named) articles of the constitution of the State of Louisiana of the year 1898.

For answer the defendant denied that there was no inquiry or proper investigation of the subject-matter prior to the promulgation of Order No. 552 of the date of October 10, 1906; it also denied that the rates established were unjust, unreasonable or improper, or that they would result in the taking of complainant's property without due process of law. Testimony was taken by depositions and upon the trial the court directed a final decree enjoining the commission from putting the rates in force as provided for in Order No. 552, and restraining the com-

mission from instituting any suit against the complainant for the recovery of any penalty by reason of complainant's failure to put into effect the rates in the order of the commission; and it was further adjudged that the tariff of rates specified in the order should be cancelled and declared to be null and void and of no effect. An injunction was issued pursuant to the decree. See opinion of Circuit Court, 156 Fed. Rep. 823.

*Mr. E. Howard McCaleb, Jr.,* with whom *Mr. Walter Guion,* Attorney General of the State of Louisiana, was on the brief, for appellant.

*Mr. William L. Granbery* for appellee.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

The complainant herein is a citizen of the State of Kentucky, while the defendant is a citizen of the State of Louisiana, and a case of diverse citizenship therefore appears on the record. The complainant is transacting its business in several States, in a territory which is said to be four hundred miles wide and one thousand miles long, beginning in Indiana and Illinois and extending through the States of Kentucky, Tennessee, Mississippi and Louisiana to the Gulf of Mexico. Its capital, from the time of its organization, to May, 1898, was $1,695,700. This capital was thereafter increased from time to time until February 1, 1907, from and after which it was $20,174,350, represented by stock issued from time to time, to that amount. This includes the amount invested in Louisiana. The evidence in the case shows that the company's affairs had been economically administered, and that its business had been conducted in the State of Louisiana, ever since its entrance into that State, with great care and economy; that the stock had not been watered; that its capital was contributed in cash and every economy possible had been practiced. Adverse criticism was

indulged in in the Circuit Court in regard to the price paid by the complainant for the property of the Great Southern Telephone and Telegraph Company, the price being, as alleged, too high, but the evidence is strongly to the contrary. And, again, the business that complainant is carrying on, the evidence shows, is regarded as hazardous by those familiar with its character, and as being still in an experimental stage with regard to the proper methods of operating, and also as to appliances and other things necessary to the conduct of its business. The property is subject to great and rapid deterioration from exposure to the weather and other causes. The profits in this kind of business are shown to be almost universally low. The complainant's charges for rates in Louisiana before the promulgation of the Order No. 552 were also shown to be as low as those of any of the companies in the country, and lower than most of them. Out of more than a dozen companies, which substantially cover the whole country, there is one which declares dividends of 7 per cent, others 6 per cent, 5 per cent, and 4 per cent, and some nothing, and some are bankrupt. The dividends of complainant have not been declared on any artificial capitalization or watered stock. Complainant has declared dividends as the result of its business through all the States, for the last few years, of 7 per cent. While it is contended by the commission that from the returns made by the complainant to it the complainant has realized upon its investment in Louisiana from 10 to 15, and even 20 per cent, yet on the other hand the complainant asserts that the returns on its investment in Louisiana have been less than 6 per cent during most of the time the complainant has been in the State, and ending June 30, 1907. It is asserted that complainant had expended in Louisiana up to June 30, 1906, $4,711,000.00 in the purchase and construction of exchanges and toll lines which amount was still further increased by June 30, 1907, to $5,394,154.43, and it is upon these totals that the percentage of net income to investment is made up.

The president of the company testified that unless things

changed and it was permitted to charge the rates which had been charged prior to the adoption of these rates which are now in question, it would be unable to continue to pay 7 per cent, and that the company would necessarily retrograde, and that while the company had paid 7 per cent to its stockholders for the past few years, it could not continue so to do if the rates in question were adopted. That it did not, in fact, receive anything like 7 per cent upon its investment in Louisiana, and that the average market for money in that State on good securities, and much more certain than telephone stock, was at least 7 per cent, and that there was no inducement to investors in the State of Louisiana, or in the New Orleans money market, to invest in stock in such a company as that of the complainant, where there was more risk and probably less return than in other investments which could be had in that city and State. This evidence was not, in terms, contradicted, though other contentions are made by the appellants. The differences between the parties as to the rate of the return upon the investment in Louisiana arise from the different data taken by them upon which to calculate the return, and will be referred to later. The single question before us is as to the character of the rates provided in Order No. 552, whether such rates are confiscatory, or, if there is any difference, whether the rates are only unreasonable, unjust and inadequate, although not confiscatory, and therefore not in violation of the Federal Constitution. The question under articles 284 and 285 of the constitution of Louisiana, *supra*, even of the unreasonableness of the rates, may be inquired into by a Federal court, by reason of the diverse citizenship of the parties to this suit, and the complainant is not confined to a state court upon this question. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 391. The complainant comes into court on both grounds, asserting that the rates are so low as to take its property in violation of the Fourteenth Amendment to the Federal Constitution, and also that the rates are so low as to be unreasonable and unjust under the above cited articles of the constitution of Louisiana.

Like any other case, the onus rests upon this complainant to prove the existence of the fact it alleges, viz., that the rates are so low as to be confiscatory, or at least unreasonable and unjust. The court below held that the rates actually established by the commission were void, because, as was stated by the court, those rates were not established upon investigation into the question of their sufficiency, but by a merely arbitrary conjecture by the commission, not based on investigation or the exercise of judgment and discretion, and the order promulgating the establishment of the rates was, therefore, illegal and void, and hence there was no presumption of the correctness of the rates, such as generally obtains in relation to rates adopted by the legislature or a commission appointed by it. See *Chicago, Milwaukee &c. Ry.* v. *Tompkins,* 176 U. S. 167, 173; *Ex parte Young,* 209 U. S. 123, 165.

We are of opinion that the court below erred in its conclusion that there was no presumption in favor of the validity of the rates promulgated by the Order No. 552. We think the evidence shows that these rates were really not adopted by arbitrary conjecture, nor does it show that they were based on no investigation or without the exercise of judgment or discretion.

It seems there had been complaints as to the tariff of rates under which the complainant was operating before the Order No. 552 was made, and the commission had investigated these complaints so far as to make a careful examination of the returns of complainant made to the commission. These returns showed generally the character and operation of the business of complainant, its income, operating expenses and investments in Louisiana. The commission, after examining them, issued the order to show cause why its rates should not be decreased; the commission on the final hearing on the return of the order to show cause took into consideration both the statement presented by the complainant on the return of that order and also the statements or returns previously filed by the company. The secretary to the commission stated that the items in these returns which had most weight in causing the commission to

reach a conclusion that the rates then charged were unreasonable were the earnings and operating expenses and net earnings, as shown by these reports made to the commission. These reports were annual, and were under oath. It appeared from the evidence of the secretary that he was aware of the fact that the taxing authorities adopted a basis of valuation on telephone property which was not its full market value; that property of this nature, like all other property, was not assessed in Louisiana at its actual value, but for an appreciably less amount, and the valuation as returned to and filed with the commission by the complainant followed the valuation placed upon its property by the taxing authorities, and that the witness therefore knew that the valuation in these reports of the complainant's property in the State of Louisiana was not its real value. He also said that in fixing a schedule of rates the commission did not adopt that valuation as a basis. The witness further stated that the commission, in acting upon the question, was of opinion that the proof showed that the company was making what the commission considered were unreasonable earnings, and that was shown by the annual reports made by it for the years 1904, 1905 and 1906, and the statement filed by the counsel for the company on his return to the order to show cause. No proof was offered to the commission in the presence of any one representing the complainant other than the statement of receipts and disbursements contained in the reports mentioned.

Now it may be true that these returns did not contain all the data upon which a very close and accurate judgment could be based as to the rates that ought to be charged by complainant, under all the circumstances. This is only saying the order may have been erroneous or based upon insufficient evidence, which is no more than saying that upon the investigation the commission may have come to a mistaken conclusion by reason of erroneous inferences from the evidence furnished by complainant's own returns, but that is far from showing that the commission had by a merely arbitrary order promulgated certain rates without making the slightest effort to obtain any

knowledge whatever upon the subject. It did not lose jurisdiction by reason of the mistakes it may have made, and as a result the rates adopted were not merely arbitrary conjectures, but based on reasons which, while they may have been insufficient, cannot be described as resulting in a decision wholly without evidence to support it. The rates, therefore, promulgated must be regarded as *prima facie* fair and valid, or, in other words, the onus was upon the complainant to show that they were, what it asserts, confiscatory or unreasonable. The court below did state in its opinion that the evidence established that the complainant had not then earned under the tariff in Order No. 488 (which existed prior to No. 552, and the rates under which were higher than those under Order No. 552), as much as 7 per cent on its Louisiana business, and it held that a profit of 7 per cent on the Louisiana business would be only a fair return on a business of this character, and therefore any reduction of existing rates would be unreasonable and unjust. If the conclusion of the insufficiency of the prior rates were justified it would probably be an answer to the claim of the commission that the reduced rates provided for in Order No. 552 were sufficient.

There are one or two facts, however, now to be taken into consideration before the correctness of that conclusion can be affirmed. In the course of the trial various questions were argued as to the manner of conducting such a business as this, with regard to extensions, earnings and disbursements, as well as questions of depreciation of plant and how to treat the amount collected therefor, and other questions of that nature. Exactly how the money which resulted from the rates in actual operation was used was not in all cases shown in detail, either from the books or by oral testimony. Something was left in doubt and to conjecture. In the course of the opinion of the Circuit Court the following was said: "It is urged by the commission that included in the Louisiana investment of complainant is a sum earned from Louisiana business, set aside in the reserve fund and then used in extending the system in

Louisiana, and now treated as a part of the Louisiana investment by the stockholders. This may be so to some extent—it is certainly possible. But it is impossible for me to determine, from the figures in the record, to what extent, if at all, it is a fact. Counsel for defendant have not themselves undertaken to indicate what, even in round figures, they consider is the sum thus earned in the business and reinvested in the business, without having been distributed to the shareholders in dividends. It will be time to consider the legal results from such a state of facts when it shall have been shown to exist in a definite sum and not in a purely conjectural amount." And again: "Counsel for the commission argued that the complainant's property in Louisiana was not all paid for with complainant's capital, but was partly paid for out of a surplus or reserve, or depreciation fund, which was accumulated by complainant from the receipts of its Louisiana business, and was then reinvested, not in repairs and maintenance, but in extensions and additions to the property. This may be a fact, but it is not shown to be a fact. The commission has power, if it wishes to do so, to direct the books of complainant to be so kept as to show such use of receipts. In the present state of the books this seems to be impossible. And the floating debt of the complainant would seem to be much greater than any sum which could possibly have been used from the reserve, or surplus, or depreciation fund for extensions and additions, after paying for maintenance and repairs."

If the onus rested upon the commission to show these facts it is evident that the obligation has not been fulfilled, but it is just here that the difficulty lies. It was obligatory upon the complainant to show that no part of the money raised to pay for depreciation was added to capital, upon which a return was to be made to stockholders in the way of dividends for the future. It cannot be left to conjecture, but the burden rests with the complainant to show it. It certainly was not proper for the complainant to take the money, or any portion of it, which it received as a result of the rates under which it was

operating, and so to use it, or any part of it, as to permit the company to add it to its capital account, upon which it was paying dividends to shareholders. If that were allowable, it would be collecting money to pay for depreciation of the property, and, having collected it, to use it in another way, upon which the complainant would obtain a return and distribute it to its stockholders. That it was right to raise more money to pay for depreciation than was actually disbursed for the particular year there can be no doubt, for a reserve is necessary in any business of this kind, and so it might accumulate, but to raise more than money enough for the purpose and place the balance to the credit of capital upon which to pay dividends cannot be proper treatment. The court below said it was impossible to find out from the books how much of this had been done, and it treated the fact as one to be explained by the commission and not by the complainant. In other words, while this fact was a material one the onus was placed upon the commission, and not the complainant, to show it. We think, on the contrary, that the obligation was upon the complainant. Now, although the books, it is said, do not show how much money collected for depreciation has been, in fact, used to increase the capital of the complainant upon which dividends were paid to stockholders, yet still, even if the books do not show accurately, or even at all, what disposition was made of these moneys, at any rate the officers of the complainant must be able to make up some reasonable approximation of the amount, even if it be impossible to state it with entire accuracy, and this duty rests with the complainant, in order that it may discharge the duty devolving upon it to prove that the rates were not unreasonably high under Order No. 488, or, in other words, that they were unreasonably low under Order No. 552. It may be that the sum, if any, thus used was not enough to affect the claim that the rates under discussion were unreasonably low. The evidence is insufficient to show clearly that which complainant is under obligations to show. *Knoxville* v. *Water Co.*, 212 U. S. 1; *Willcox* v. *Consolidated Gas Co. of New York*, 212 U. S. 19. W'

are not considering a case where there are surplus earnings after
providing for a depreciation fund, and the surplus is invested in
extensions and additions.  We can deal with such a case when it
arises.

The evidence in this case applied generally to the actual
operation of complainant's business under rates in existence
prior to those contained in Order No. 552, and higher than those
contained in that order, and the evidence, as contended, showed
that even under those rates the profits were not unreasonably
high.  It is not such a case, therefore, as looks only to the possi-
ble effects of the future enforcement of the rates claimed to be
too low.  If higher rates have been in operation, and the result
has shown that they were only reasonable and fair rates, it
would in such a business as this follow, with considerable cer-
tainty, that with lower rates the profits would be decreased
and become unreasonably low.  We say this because the evi-
dence shows that in the case of telephone companies the general
result of a reduction of rates in some other kinds of business
does not always follow, namely, that there would be an in-
creased demand, which could be supplied at a proportionately
less cost than the original business.  Such, it is admitted, would
be the case generally in regard to water companies, gas com-
panies, railroad companies, and perhaps some others, where the
rate is a reasonable one.  For example, it is said that it would
cost no more, or certainly scarcely an appreciable amount more,
to haul a train of two cars both filled than it would to haul the
same train with both cars half filled, and if the reduction in
rates should result in filling the cars where previously they had
not been half filled, there might be an increased carriage at a
cost very little more than before, and probably an increased
profit.  So, in the case of a water company, the reduced rate
might result in furnishing more water to consumers already
existing, and the increased cost of furnishing the same would be
infinitesimal, where there was a supply sufficiently large to fill
the demand.  So, also, in furnishing gas at reduced rates, the
reduction in the rate would very probably result in increased

LOUISIANA R. R. COMM. v. CUMBERLAND TEL. CO. 427

consumption, not only in increased demands from more consumers, but also an increased consumption by consumers already existing, and the increased cost of furnishing the gas would be nothing like in proportion to the increase in consumption. In these cases increased profits might be the result of decreased rates. But with telephone companies, as shown by the testimony of the president of the complainant, the reduction in toll rates does not bring an increased demand, except upon the condition of corresponding increase in expenses. As an illustration the witness took a telegraph company which, as he said, "employs one wire and can send several messages at the same time over that one wire; it employs its own operators to send the message, who consult each other's time and convenience in the handling of it, while the telephone company has to employ two wires, the sender of the message is his own operator, and the telephone operator simply fashions up the facilities for him, and the customer sends his own message, and becomes, therefore, his own operator, hence his convenience and time must be consulted; we have to be ready, in other words, with the operators and the appliances to suit the convenience of the customer, whereas in the telegraph business it is just the other way; the customer brings in his message, and when it suits the convenience of the company to employ its operators and its apparatus to send it, they send the message." The witness then gave further illustration in proof of his contention that the reduction of rates in the telephone business does not increase the business without corresponding increase in the expense.

We do not think this case is one where the bill should be dismissed, even without prejudice, for the reasons that we have stated, that the inquiry has been founded upon the actual effect of rates higher than those permitted under Order No. 552, and therefore that it is not merely conjecture as to what the result of such lower rates would be, the tendency of the evidence being to the effect that the higher rates are still reasonable, and that the lower rates would be unreasonably low. But the burden, as

we have said, rests with the complainant to prove its case, and it has not performed its obligation when this fact as to the disposition of the so-called depreciation fund is left so wholly in doubt. What is the amount reserved for payments for depreciation? What, if any of it, has been carried into capital? How much of the floating debt would carry interest which might be charged as against the amount of the depreciation fund actually used for extensions and additions and charged to capital? All these are questions not answered by the evidence in the case, and which should be made as clear as possible before an attempt ought to be made to answer the question as to rates. The whole case should, therefore, be opened, so that both sides can, on a new trial, bring out all the material facts upon which a decision can finally be based.

We, therefore, reverse the decree and direct a new trial.

*Reversed.*

MR. JUSTICE WHITE, not having heard the argument, did not take part in the decision of the case.