**ALLIED CIVIC GROUP, Inc., et al.,**
Petitioners,

v.

**PUBLIC UTILITIES COMMISSION OF THE DISTRICT OF COLUMBIA, Respondent, and Capital Transit Company, Intervenor.**

Civ. A. No. 2157–54.

United States District Court
District of Columbia.

Oct. 19, 1954.

George Spiegel, pro se, John P. Dodge, Washington, D. C., for petitioners.

Vernon E. West, Esq., Corp. Counsel for D. C., Washington, D. C., Lloyd B.

Harrison, Sp. Asst. Corp. Counsel, Washington, D. C., for Public Utilities Commission. Edmund L. Jones, F. Gloyd Awalt, W. V. T. Justis, F. Keith Kelly, Washington, D. C., for Capital Transit Co. Intervenor.

KEECH, District Judge.

This is an appeal from Order No. 4052 of the Public Utilities Commission of the District of Columbia, increasing fares to be charged by the Capital Transit Company for service in the District of Columbia. The order, dated January 20, 1954, and effective January 31, 1954, was issued after a protracted hearing on the petition of the Capital Transit Company, filed April 3, 1953, seeking an increase in its existing rates. The record below consists of some 3200 pages and 73 exhibits, and incorporates by reference numerous other orders and material. The petitioners are all residents of Maryland and users of the Company's railway and motor bus lines within the District of Columbia,[1] who claim to be adversely affected by Order No. 4052. One of the petitioners, George Spiegel, Esq., was permitted limited intervention in the proceeding before the Public Utilities Commission and appeared before the court on behalf of himself and the other petitioners.

A petition for reconsideration filed by the petitioners with the Public Utilities Commission was deemed denied, under the terms of § 43-704, D.C.Code, the Commission not having acted thereon within thirty days after its filing.

This appeal was brought against the Commission, as respondent, under § 43-705, D.C.Code. The Capital Transit Company was permitted to intervene as a respondent. The scope of the proceeding is narrowly defined by the statute. Under the terms of § 43-705, it must be heard upon the record before the Commission and no new or additional evidence may be received by the court. The petitioners may not in any court urge or rely on any ground not set forth in

1. A motion to dismiss as to the plaintiffs Allied Civic Group, Inc., and Prince Georges County Civic Federation, Inc., was granted before trial.

their application for reconsideration. § 43–704, D.C.Code. The court's review is limited to questions of law, and the findings of fact by the Commission are conclusive, unless it appears that they are unreasonable, arbitrary, or capricious. § 43–706, D.C.Code.

Petitioners set forth in their pleadings many allegations of error, but in the course of the four-day proceedings before the court, these were reduced to twelve points, eleven of which were pitched on the basic contentions either that the Commission's order lacked the necessary findings as to essential elements or that such findings as were made lacked the support of substantial evidence, the twelfth issue being purely a question of law. Each and all of these challenges were denied by the respondent Public Utilities Commission and the intervenor Capital Transit Company. The latter claims that if anyone has a grievance against the order it is the Company, not the consumers.

At the close of the petitioners' case, the Commission and Transit Company moved to dismiss. They conceded that an appeal to the court would lie from the Commission's order and that petitioners were properly before the court, but argued that they had failed to allege, much less prove, that they were harmed by the order in question or that the rates fixed were unreasonable, arbitrary, or capricious. Counsel for the petitioners has conceded that he is without information which would enable him to conclude what rates would have been fixed had the order included the essential findings which he contends were omitted, but argued that without these findings the order is arbitrary and capricious and any rate fixed by it is unlawful and invalid. The motions to dismiss were denied by the court without prejudice. Thereupon the Commission and Company proceeded with their defense of the order, renewing their motions to dismiss at the close of their defense.

In reviewing any order of the Public Utilities Commission the court must be guided by certain general principles of law.

There is a presumption in favor of the validity of the orders of public service commissions. Lone Star Gas Co. v. State of Texas, 1938, 304 U.S. 224, 240, 58 S.Ct. 883, 82 L.Ed. 1304; Union Dry Goods Co. v. Georgia Public Service Corp., 1919, 248 U.S. 372, 374, 39 S.Ct. 117, 63 L.Ed. 309; Louisiana Railroad Commission v. Cumberland Telephone & Telegraph Co., 1909, 212 U.S. 414, 421, 29 S.Ct. 357, 53 L.Ed. 577.

"He who would upset the rate order * * * carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333; Potomac Electric Power Co. v. Public Utilities Commission, 1946, 81 U.S.App.D.C. 225, 228, 158 F.2d 521, 524, certiorari denied 1947, 331 U.S. 816, 67 S.Ct. 1303, 91 L.Ed. 1834.

In the absence of a contrary statute, a commission is not bound to use any single formula or combination of formulae in determining rates. "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry * * * is at an end." Federal Power Commission v. Hope Natural Gas Co., supra, 320 U.S. at page 602, 64 S.Ct. at page 287, 88 L.Ed. 333; Washington Gas Light Co. v. Baker, 1950, 88 U.S.App.D.C. 115, 118, 188 F.2d 11, 14, certiorari denied 1951, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686.

Basic findings are necessary, but it is not necessary to include subsidiary findings as to all details. So long as the order in its entirety makes clear the factual basis on which the findings and conclusions are based, there is no ground for complaint. Although the ultimate conclusions of the commission must be supported by basic findings, this does not

mean each finding must be annotated by the evidence supporting it. United States v. Pierce Auto Freight Lines, 1946, 327 U.S. 515, 529, 66 S.Ct. 687, 90 L.Ed. 821.

■ Findings need take no particular form, and need not be labeled as such. "There is no requirement that the Commission specify the weight given to any item of evidence or fact or disclose mental operations by which its decisions are reached." Baltimore & Ohio Railroad Co. v. United States, 1936, 298 U.S. 349, 359, 56 S.Ct. 797, 803, 80 L.Ed. 1209.

■ As stated by our Court of Appeals: "The process of public utility regulation is fraught with sundry technical accounting, engineering, and financial policy considerations, that have been properly entrusted to the regulatory bodies, and if there is produced ' * * no arbitrary result, our inquiry is at an end'." United States v. Public Utilities Commission, 1946, 81 U.S.App.D.C. 237, 240, 158 F.2d 533, 536, certiorari denied 1947, 331 U.S. 816, 67 S.Ct. 1305, 91 L.Ed. 1835, citing Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037.

Section 43–1003 of the District of Columbia Code provides that substantial compliance with the requirements of the Public Utilities Act shall be sufficient to give effect to all orders of the Commission and they shall not be declared invalid for any omission of a technical nature.

Considering each of the petitioners' twelve points in turn:

1. *Officers' salaries and directors' fees and expenses:*

Petitioners contend that the order is deficient in its failure to make a finding as to the amount of excessive salaries paid to certain officers and in allowing as operating expense the total amount paid, after stating that such salaries appear excessive.[2]

The table of salaries appearing at page 11 of the order is not part of the record before the Commission, but was taken from the annual reports of the Company filed with the Commission, which are matters of public record. The comparison with salaries paid transit officials in other cities is also based on material outside the record. The record below discloses that at the time of the hearing the Commission's staff challenged the salary paid to the Chairman of the Board, Mr. Wolfson, and in its order the Commission effected a reduction of $15,000 in the allowance for his salary. The only other challenge of salaries was as to the fee paid to E. C. Gerbert of Jacksonville, Florida, in the amount of $8,700 for "public relations services." The order shows on its face that the Commission eliminated this amount in its considerations. The Commission's comments in the order relating to other officers' salaries are therefore not based on any evidence at the hearing. Although the information concerning salaries was available to Mr. Spiegel in public records and he was present at the hearing, he raised no question at that time as to excessive allowance for other officers' salaries.

Petitioners further complain that although the Commission in its order found there had been presented no adequate justification for the increase in directors' fees and travelling expenses to

2. The order states: "The salaries paid to Wolfson (even after the reduction), Broadwater, Weinstein and Harvey are high, considering among other things the Company's earnings position, the salaries paid to transit officials in cities of comparable size, such as Cincinnati, Baltimore and St. Louis, and the inexperience of these individuals in public utility operations. In our review of this record, we are not satisfied that sub-

stantial reductions could not be made in allowance for officers' salaries, as an item of operating expenses. However, such reductions if made, would not be sufficient in amount to affect the appropriate fare structure discussed later herein, or to affect substantially the gross operating expenses for the Future Annual Period. Therefore, we have refrained from further action on this item for purposes of the present case." (Page 12.)

out of town directors,[3] the Commission failed to find and disallow the amount of such excess, stating that it disregarded such amount because the sum involved was not sufficient to require a recalculation of record figures for the future annual period. Petitioners contend that it was the duty of the Commission to investigate and make a finding as to whether such fees were, in fact, excessive.

Here again, the petitioners' objection arises from a statement of the Commission in the order which throws a cloud on an item of expense allowed. As shown in the table at note 13, infra, however, the Commission correctly found that the amount involved was not sufficient to require a recomputation of operating expenses.

### 2. Legal fees:

The Commission in a footnote at page 13 of the order noted that according to the Commission's records annual average legal fees in excess of $5,000 paid to "outside" lawyers by the Company for the period 1950–1952, inclusive, had increased $71,000 over the period 1947–1949, inclusive, "which is not consonant with the Company's professed emphasis on operating economies." This note further shows that no question as to the allowance for legal fees was raised at the hearing.

In the absence of any information, the petitioners were not in a position to contend that the increase in legal fees was unjustified, but they took the position that it was sufficient to require the Commission to investigate and make a finding as to whether or not the fees were excessive.

This is another instance of objection by petitioners based, not on evidence in the record, but on a gratuitous statement included in the Commission's order. Assuming that investigation would have resulted in disallowance of the

whole amount of the increase, it would not have had a material effect on the rate of return.[4]

### 3 and 4. *Over-accruals in reserves for injuries and damages and for income tax liability:*

The petitioners complain that the Commission, although it found that "In the past, substantial overaccruals in these accounts have occurred from time to time, with adverse effects on apparent rate of return during these periods," failed to make any finding as to the amount of such over-accruals or to disallow any excess in its computation of the necessary reserves for the future test period. The petitioners argue that having found the reserve for injuries and damages had accrued to such an extent that in 1945 the Company transferred half a million dollars from it to surplus, the Commission could not logically accept 4% as the continued rate of accrual for this reserve, and that allowance of 4% was not supported by any finding that it bears a rational relationship to the reserve necessary.

The record shows merely that the exhibits were based on an allowance for injuries and damages of 4% of operating revenues, the rate which had been in effect for some time. No question as to the propriety of this accrual rate was raised on the record. Although the order mentions transfer by the Company of $500,000 from this reserve to earned surplus in 1945, there is no finding that a substantial over-accrual existed at the time of the hearing and there is no evidence in the record to support such a finding.

As to the reserve for income tax liability, although the order mentions "substantial recent over-accruals of income tax liabilities," this refers to over-accruals in the years 1949 and 1950, as shown by Exhibit No. 33, which was purely historical in nature and had **no**

---

3. "Although the matter of justification was specifically presented in the record, no adequate reasons were advanced for the increase in directors' fees, nor for the

allowance of traveling expenses to out-of-town directors." (Order No. 4052, p. 12.)

4. See table, note 13, infra.

bearing on calculations of required increase in revenues in this proceeding. An explanation of the over-accruals by the Commission's accountant appears at pages 1222–1224 of the record. The Commission's finding that there is not sufficient basis for adjustment at this time is supported by evidence in the record.

5. *Allocation of income tax expense:*

The petitioners complain that the Commission computed federal income tax liability on the basis of the tax applicable to District of Columbia operations as a unit, without reflection of the tax saving resulting from lowered tax rate due to the loss on Maryland operations, instead of allowing the lesser amount of taxes actually paid.

■■ The Commission requires allocation of revenues and expenses between the District and Maryland operations of the Company. It is consistent therefore to allocate as to all items of revenue and expense on a unit basis. This is not rendered arbitrary merely because under present conditions adoption of a different method might result in a reduction of expenses of District operations. There is authority supporting the use of actual taxes paid on an over-all basis,[5] and authority supporting the method of allocation used by the Commission.[6] This is an area in which the Commission's finding must be adopted, even if the court were to believe that use of the actual tax figures would more truly reflect the amount necessary as income tax liability reserve.[7] Since there is no statutory prohibition of the method adopted by the Commission and it has a rational basis, the court is without authority to overrule the Commission.[8]

6. *Normal passenger decline:*

In adjusting revenues and expenses for the future test period, the Commission used 3.6% for normal passenger decline, adopting the opinion of the expert witness Smith. The petitioners accepted this estimate with a compensating reduction in operating expenses of .5% for every 1% of passenger decline. At the hearing of this case, their sole challenge of this normal decline figure was as to the right of the Commission to adopt the expert's opinion without including in the order findings analyzing the bases of the expert's conclusions. Petitioners further complain that although an adjustment was made in operating expenses and certain taxes to reflect normal passenger decline, no adjustment was shown as to other taxes, such as payroll, bus mileage, and gasoline tax. They contend further that if an adjustment of 3.6% normal decline is made, it should be carried over into the rate base, on the ground that there will be an acceleration of retirement of property related to passenger decline.

The court holds that the record supports the Commission's adoption of the expert opinion of a 3.6% normal passenger decline and that the order contains adequate findings, reflecting a rational basis for the ultimate conclusion on this issue. If there be error in failing to adjust some accounts for the 3.6% decline, it is not such omission as will invalidate the order.

7. *Fare resistance factor:*

Complainants challenge reduction of operating revenues for the future test period by 2.27% to reflect an anticipated fare resistance decline in passengers, without an offsetting reduction in operating expenses.

The Commission concedes that the order contains no mathematical computa-

5. In re New Jersey Power & Light Co., 1952, 9 N.J. 498, 89 A.2d 26; Arkansas-Louisiana Gas Co. v. City of Texarkana, D.C.1936, 17 F.Supp. 447, 464.

6. Public Utility Accounting, Foster and Rodey, Prentice Hall, N.Y., 1951, p. 471; Restatement and Revision of Accounting Research Bulletins, Accounting Research Bulletin No. 43, p. 88, American Institute of Accountants (1953).

7. State Corp. Commission of Kansas v. Federal Power Commission, 8 Cir., 206 F.2d 690, 709.

8. Dobson v. Commissioner, 1943, 320 U.S. 489, 502, 64 S.Ct. 239, 88 L.Ed. 248.

tion as to the decrease in operating expenses by reason of the 2.27% fare resistance decline, although operating revenues for the future test period were reduced by that amount.[9] While the Commission should have included in the record evidence as to the effect of the fare resistance decline on operating expenses and reflected such reduction in its computations, or found in the order that no reliable opinion could be expressed as to a compensating reduction in operating expenses, omission of such evidence and findings is not sufficient to warrant the court in holding the order invalid. Assuming that there should have been an off-setting reduction in operating expenses, the amount would not have materially affected the calculation of rate of return.[10]

8. *Findings as to rate base:*

Petitioners contend that the rate base of $23,420,691 found by the Commission is not supported by adequate findings or evidence in the record, particularly as to depreciation reserve. It is their position that the order should disclose the specific figures used, as was done in some prior orders. As to the 4.3% rate of depreciation used by the Commission, the rate adopted pursuant to a stipulation between the Company and Commission and formally approved by Order No. 4001 of the Commission, petitioners contend that the stipulation could not free the Commission from the requirement of evidence in the record to support the depreciation rate used and a finding that

the rate is reasonably related to actual depreciation. Petitioners question the adequacy of the book depreciation accruals, but candidly admit they are without facts.

In finding the rate base the Commission, in conformity with its practice over the years, utilized the depreciated original cost method, deducting from adjusted original cost the depreciation accrued on the books of the Company. In projecting for future operating expenses, the Commission used 4.3% as the composite rate of depreciation accrual.

Order No. 3994 of the Commission, dated May 7, 1953, ordered an investigation of the practices, charges, and accounting by Capital Transit Company relating to depreciation and consolidated that investigation with the instant rate investigation. After completion of the Commission's study, a prehearing conference, held May 29, 1953, in accordance with the Commission's rules, resulted in a stipulation between the Company and Commission establishing a revised schedule of rates of annual depreciation accruals for the various classes of property, which decreased the composite rate of depreciation from 4.9% to 4.3%. The stipulation was approved by Order No. 4001, which separated the depreciation investigation from the fare increase proceeding. The record in the depreciation study is not a part of this record, but the stipulation and Order No. 4001, approving it, were incorporated by reference in this case.[11]

---

9. The only mention in the order of possible reduction in operating expenses for fare resistance decline appears at page 40, where the Commission stated: " * * * the savings in expenses that might follow the loss of passengers resulting from the 'resistance factor', when fares are increased, are not reflected in the foregoing amount of net operating income, and can therefore be considered as an offset to the possibility that 'normal decline' of the Company's passenger traffic may develop at a rate in excess of the most pessimistic forecast made by any of the witnesses who dealt with this subject."

But at page 30 of the order it is stated:

"With regard to the extent of normal decline of transit riding in Washington in the immediate future, the maximum used by way of forecast by any witness is Smith's 3.6 per cent."

10. The table at note 13, infra, which reflects some of the adjustments suggested by Mr. Spiegel, omits any adjustment to either operating revenues or operating expenses for the 2.27% fare resistance decline.

11. Order No. 4001 states: "A study has been recently completed by the staff of the Commission to determine what revisions, if any, should be made in the rate or rates for accruing depreciation. This

It seems to the court implicit in the Commission's acceptance, after investigation by its staff, of a lower composite rate for annual depreciation accrual that the Commission was content that the figure theretofore used not only was adequate, but in fact was too large. Reduction of the depreciation rate from 4.9% to 4.3% favored the transit riders in that it resulted in lower operating expense for depreciation.

The court finds that the rate base adopted by the Commission is supported by the record and that the order contains adequate findings on this point.

9. *Allowance for working capital:*

The petitioners contend that no allowance for working capital and supplies is necessary in view of the fact that the Company has over-accruals in the reserves for injuries and damages and for income tax liability and advance cash from fares.

Over the years the Commission has included in its calculation of rate base an allowance for working capital limited to material and supplies, cash working capital having been eliminated on the theory that the receipt of cash fares makes it unnecessary. Allowance for working capital is a practice generally followed by regulatory bodies.

As stated under Points 3 and 4, there is no evidence in the record that there are at present over-accruals in the reserve for injuries and damages or reserve for income tax liability.

With the new rate structure, it would appear that elimination of the weekly pass and substitution of the weekly permit at a substantially reduced price, will effect a reduction of advance cash which the Company can expect to receive. The court therefore finds that there is a rational basis for the Commission's inclusion of this allowance in its determination of rate base.

10. *Use of depreciated original cost rate base:*

The petitioners contend that the order is invalid because the Commission failed to make a specific finding that use of the present method of determining rate base (cost of used and useful property, less accrued depreciation, plus working capital allowance) is justified under present economic conditions of the Company. Petitioners point out that the Commission's order, after discussing the similarities of the Company's situation to that of the street railway involved in Market Street Railway Co. v. Railroad Commission of State of California, 1945, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171, where an economic rate base was substituted for the prior reproduction cost method, makes no findings justifying retention of the present method of determining rate base of the Company.

Petitioners rely on the decision in Washington Gas Light Co. v. Baker, 1950, 88 U.S.App.D.C. 115, at page 121, 188 F.2d 11, cert. denied 1951, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686, where it was held that the Commission could not rely on the finding in a prior proceeding of 6% as a proper rate of return without some indication in the record that pertinent local conditions and economic conditions generally had remained static.

In the case at bar, the order contains many findings as to the economic situation of the Company, based on evidence in the record, and specifically concludes that there is no justification for abandoning at this time the present method of calculating rate base. No particular form of finding is required.

study has been reviewed by the Company, and agreement has been reached * * * as set forth on the appendix attached hereto. At a pre-hearing conference in the above captioned proceeding on May 29, 1953, the results of the staff study and revised schedule of depreciation rates as agreed to by the parties were presented for consideration by the Commission.

"After consideration of the facts presented at the pre-hearing conference, the Commission is of the opinion that the rates proposed for the various classes of property are proper and should be adopted."

The court therefore concludes that this contention of petitioners is without merit.

### 11. *Rate of return:*

The petitioners contend that the order omits essential findings as to the bases of the Commission's conclusion that 6¼% to 6½% is a fair rate of return.[11-a]

■ The court holds that the discussion of rate of return, covering six pages of the order, amply discloses a rational basis in the record for the Commission's conclusion as to rate of return, and that the Commission had no duty to make more detailed mathematical findings.

### 12. *Jurisdiction of the Commission to consider through Maryland-District rates:*

The petitioners' final point is that the Commission erred in limiting its inquiry to the fixing of intrastate fares for the District of Columbia service and refusing to consider rates for through service to Maryland riders coming into the District, on the ground that interstate rates are outside the jurisdiction of the Commission.

Petitioners argue that a reading of certain language in the Unification Agreement [12] which resulted in creation of Capital Transit Company, together with Section 8 of the Merger Act, Pub. Res. 47, 72d Congress, approved January 14, 1933, indicates that the Commission has authority to consider the particular problems of the interstate riders of the Company, who now pay a dual fare, with a view to fixing a rate which would encourage such riding.

■ The court holds that the statute cited does not empower the Commission to fix rates which would discriminate against intrastate passengers in favor of interstate riders, and that the Commission was correct in holding it was without jurisdiction to fix interstate rates.

Various other points in support of the principal contentions were raised by Mr. Spiegel on behalf of the petitioners. Many of these were attacks upon the accounting methods of the Commission. The court does not deem it necessary to discuss these, since all dealt with matters within the Commission's discretion and judgment.

Petitioners, as to a number of the items questioned by them, stated that in view of the absence of evidence in the record or lack of mathematical finding in the order, they could make no estimate of the effect of possible disallowance on the rate of return for the future test period. Assuming that the whole of each of these contested items should be disallowed (which petitioners did not claim should be done, since further investigation might have disclosed justification for all or part of each item), and using the present method of determining rate base and the rates in effect prior to Order No. 4052, the rate of return to the Company would be 7.35%, only a little over 7%, which the Commission found would be within the area of fair rate of

11-a. The order (p. 26) indicates that up to 7% return would be within the fair and reasonable range.

12. "Second: The New Company shall be incorporated under the provisions of Subchapter IV of Chapter XVIII of the Code of Law of the District of Columbia and pursuant to an Act of Congress entitled 'An Act to permit the merger of street-railway corporations operating in the District of Columbia, and for other purposes,' approved March 4, 1925, *with power subject to the approval of the Public Utilities Commission to acquire, construct, own, and operate directly transit properties* within the District of Columbia and either directly or through subsidiaries *in adjacent States, * * *.*" Unification Agreement, incorporated in Merger Act, Pub.Res. 47, 72d Congress, 47 Stat. 753, as corrected, Pub.Res. 54, 72d Congress, 47 Stat. 819.

"SEC. 8. * * * all powers granted by this resolution to the Capital Transit Company shall be exercised subject to the supervision of and regulation by the Public Utilities Commission as provided by law." Pub.Res. 47, 72d Congress, 47 Stat. 760.

return,[13] and no increase in rates would have been justified. However, in view of the conclusions heretofore set forth with respect to the items questioned by the

13. The following table assumes disallowance of the total amount of increase in officers' salaries, directors' fees, and legal fees; adjusts federal income tax reserve to reflect loss on Maryland operations of the Company; and excludes from rate base an alleged deficiency in depreciation reserve and allowance of working capital for materials and supplies.

Capital Transit Company
Restatement of Page 20 of Order No. 4052 Based on
Adjustments Proposed by Mr. Spiegel

|  | Exhibit No. 38 | Spiegel Adjustments | As Adjusted |
|---|---|---|---|
| Operating Revenues: |  |  |  |
| Passenger Revenues | $27,409,365 |  | $27,409,365 |
| Station and Vehicle Privileges | 202,844 |  | 202,844 |
| Switching Revenues | 81,067 |  | 81,067 |
| Other Operating Revenues | 2,912 |  | 2,912 |
| Total Operating Revenues | $27,696,188 | $ | $27,696,188 |
| Operating Revenue Deductions: |  |  |  |
| Operating Expenses | $21,927,472 | $ 165,088a | $21,762,384 |
| Depreciation | 1,936,736 |  | 1,936,736 |
| Operating Taxes: |  |  |  |
| General Taxes | 1,374,912 |  | 1,374,912 |
| D. C. Income Taxes | 92,128 | 8,254b | 100,382 |
| Federal Income Taxes | 1,116,399 | 81,554c | |
| | | 139,000d | 1,058,953 |
| Total Taxes | $ 2,583,439 | $ 49,192 | $ 2,534,247 |
| Total Operating Revenue Deductions | $26,447,647 | $ 214,280 | $26,233,367 |
| Net Operating Income | $ 1,248,541 | $ 214,280 | $ 1,462,821 |
| Weighted Investment in Rate Base Property | $23,420,691 | $ 3,511,125e | $19,909,566 |
| Rate of Return Earned | 5.33% |  | 7.35% |

a Exclude from Operating Expenses:
| | | |
|---|---|---|
| Excessive salaries and directors' fees | | $ 106,000 |
| Excessive legal fees | | 71,000 |
| | | $ 177,000 |
| Allocated to D. C. operations—93.27% | | $ 165,088 |

b Increase in D. C. Income Taxes based on above adjustment to operating expenses—5% — $ 8,254

c Increase in Federal Income Taxes based on above adjustment to operating expenses:
$165,088 — $8,254 = $156,834 × 52% = — 81,554

d To adjust Federal Income Taxes to include the tax saving applicable to the loss on non-jurisdictional operations—
(Difference between income taxes as shown for total operations and as allocated to D. C. operations on Exhibit No. 38) — 139,000

e To exclude from the rate base:
| | | |
|---|---|---|
| Deficiency in Depreciation Reserve | $2,430,000 | |
| Allowance for Materials and Supplies | 1,320,000 | |
| | $3,750,000 | |
| Allocated to D. C. operations—93.63% | | 3,511,125 |

This table makes no adjustments in either operating revenues or operating expenses for 3.6% normal decline or 2.27% fare resistance decline.

petitioners, it is evident that the Commission was justified in allowing the Company some increase in fares.

Considering the order as a whole, it is obvious that the Commission made an honest attempt to reach a fare which would be just to both investor and consumer, painstakingly considering the many highly technical elements essential to a rate determination. If the Commission erred in some subsidiary calculations, such error did not affect the justice and reasonableness of the ultimate conclusion.

Apart from the fact that the record justifies the action of the Commission, it should be borne in mind that petitioners, although present at the hearing below, did not raise any question on the record as to a number of the items challenged. Further, many of their challenges, as admitted by their counsel, were pitched on gratuitous statements by the Commission in the order which tended to put a cloud on some items, or on information received as to matters which transpired after issuance of Order No. 4052.

Mere inept language or verbal cloud is not sufficient to render an order invalid when it includes basic findings as to essential elements, there is evidence in the record to support those findings, and a rational conclusion has been reached.

Many matters outside the record were argued by the petitioners, the defendant, and the intervenor. Obviously, the court may not act on evidence outside the record, and such matters are not available for consideration on this appeal.

The path of every public utilities commission is fraught with many pitfalls. In its rate-making function the Commission may be likened to a tight rope walker. It must balance carefully between the interests of consumer and investor while treading the line of just and reasonable rates. The bamboo pole which aids its performance is the fact that the ultimate decision is one for its enlightened judgment. In issuing Order No. 4052, the Commission has not lost its balance.

### Conclusion

The court finds that the rate base method used by the Commission and the rate base figure found by the Commission were fair and reasonable; that the findings essential to the rate-making process were made and supported by substantial evidence; that there was no error of law justifying reversal of the Commission's order under the governing statute as interpreted by the courts; and that there was no proof that the rates fixed are unfair, arbitrary, or capricious. The court therefore holds that the appeal must be dismissed and the order affirmed.