293 F.2d 761
 40 P.U.R.3d 284
 TENNESSEE GAS TRANSMISSION COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
MANUFACTURERS LIGHT AND HEAT COMPANY, Ohio Fuel Gas Company,
and United FuelGas Company, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 18547 and 18597.
 United States Court of Appeals Fifth Circuit.
 Aug. 2, 1961, Rehearing Denied Oct. 5, 1961.
 
 Harry S. Littman, Dale A. Wright, Harold Talisman, Jack Werner, Washington, D.C., Wm. R. Brown, William C. Braden, Jr., Baker, Botts, Andrews & Shepherd, Houston, Tex., for Tennessee Gas Transmission Co.
 Peter H. Schiff, Atty., Howard E. Wahrenbrock, Sol., John C. Mason, Gen. Counsel, Luke R. Lamb, Asst. Gen. Counsel, Washington, D.C., for Federal Power Comm.
 Brooks E. Smith, James G. O'Neill, New York City and William C. Spence, Houston, Tex., for Manufacturers Light and Heat Co., Ohio Fuel Gas Co. and United Fuel Gas Co.
 William Anderson, John P. Egan, Jr., Pittsburgh, Pa., of counsel for Manufacturers Light and Heat Co.
 W. F. Laird, Ralph N. Mahaffey, Columbus, Ohio, of counsel, for Ohio Fuel Gas Co.
 R. K. Talbott, Herbert W. Bryan, Charleston, W. Va., of counsel, for United Fuel Gas Co.
 Robert E. Jamison, New Castle, Pa., for Intervenors Anchor Hocking Glass Corp., and others.
 Herzel H. E. Plaine, Wash., D.C., David Stahl, City Sol., Pittsburgh, Pa., Amicus Curiae.
 Before TUTTLE, Chief Judge, CAMERON and WISDOM, Circuit Judges.
 
 
 1
 TUTTLE Chief Judge.
 
 
 2
 These two petitions for review of orders of the Federal Power Commission attack, from somewhat different points, interim orders finding a 6 1/8% rate of return just and reasonable, and putting said rate of return into effect before resolving other issues touching on the allocation of costs between different zones of operation of Tennessee Gas Transmission Company. Generally the name 'Tennessee' will be used interchangeably with petitioner, and the name 'Columbia Companies' will be reserved to discuss the petition of Manufacturers Light and Heat Company, The Ohio Fuel Gas Company and United Fuel Gas Company.
 
 
 3
 The history of the proceedings leading up to the orders complained of is taken almost completely from the statement in petitioner's brief. In using ushc statement we have, however, eliminated some expressions of opinion and explanatory statements:Tennessee owns and operates a natural gas pipeline system extending in a northeasterly direction from its sources of supply in Texas and Louisiana through the States of Texas, Louisiana, Arkansas, Mississippi, Alabama, Tennessee, Kentucky, West Virginia, Ohio, Pennsylvania, New Jersey, New York, Massachusetts, New Hampshire, Rhode island and Connecticut. The rates charged by Tennessee for the transportation f natural gas and sales for resale of natural gas in interstate commerce are subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C.A 717-717w).
 
 
 4
 On October 5, 1959, Tennessee filed with the Commission, pursuant to Section 4(d) of the Natural Gas Act, schedules of rate changes designed to recover the increased cost of providing natural gas service. These schedules set forth the respective rates proposed by Tennessee for each type of service in each rate zone on the Tennessee system. The Tennessee system is divided into six rate zones, with rates differing among the zones to give effect to distance, as well as other factors.
 
 
 5
 By order issued November 4, 1959, the Commission ordered a hearing to determine the 'lawfulness' of the rates which had been filed. Following a five-month period of suspension, the rates became effective April 5, 1960, subject to an undertaking by Tennessee, required by Commission order, to 'refund at such times and in such manner as may be required by final order of the Commission, the portion of the increased rates found by the Commission in this proceeding not justified, together with interest thereon at the rate of 7 percent per annum.'
 
 
 6
 Hearings commenced on February 2, 1960, and continued intermittently until recessed on May 25, 1960. During the course of the hearings, Commission Staff Counsel moved that the hearing be divided into two phases. He proposed that the first phase deal solely with the issue of rate of return, and the remaining issues be reserved for a later stage of the proceeding. Staff Counsel further proposed that upon completion of the first phase of the proceeding, the Examiner's decision be omitted; that the Commission issue a decision determining the fair rate of return for Tennessee; and that the Commission issue an interim order requiring tennessee to reduce its rates and make refunds, in the event the Commission concluded that the fair rate of return is less than claimed by Tennessee.
 
 
 7
 When Staff Counsel made his motion, there was pending before the Commission, in another proceeding involving Tennessee (Docket No. G-11980), an issue as to the proper method of allocating Tennessee's cost of service among its six rate zones and various services. By order issued April 30, 1959, in Docket No. G-11980, the Commission ruled that determination of the allocation issue should be expedited and, to that end, severed that issue for separate and prior hearing and determination in that case. At the time Staff Counsel made his motion, the allocation issue had been throughly tried and briefed and was before the examiner in the instant proceeding had Examiner in the instant proceeding had ruled that the determination of the allocation issue in Docket No. G-11980 would govern the method of allocating Tennessee's cost of service in this case.
 
 
 8
 Since it contended that determination of the allocation issue was required in order to translate the cost of service into rates for the various zones and services, Tennessee filed a memorandum opposing the Staff's motion for an interim order on the ground, inter alia, that such order would be illegal unless the Commission simultaneously determined the allocation issue. On July 19, 1960, Tennessee filed a motion with the Commission requesting it to determine the allocation issue simultaneously with the issue of rate of return. By order issued August 5, 1960, the Commission denied Tennessee's motion.
 
 
 9
 On August 9, 1960, the Commission issued its order, herein sought to be reviewed, adopting the Staff's interim order procedure. As stated above, by such order the Commission disallowed Tennessee's claim for a 7 percent return, fixed a 6 1/8 percent rate of return, required Tennessee to file reduced rates retroactively to April 5, 1960, and required Tennessee to make refunds for the differences in rates collected since April 5, 1960. The Commission's order did not, however, make any determination as to the proper method of cost allocation which should be employed in allocation the reduced cost of service among the six rate zones on the Tennessee system. Nor did the Commission make a determination as to which of the various rates filed by Tennessee were unlawful, which rates should properly be reduced, or to whom refunds were lawfully due. Instead, the Commission left hese questions open for later determination.
 
 
 10
 On August 29, 1960, Tennessee filed its application for rehearing which the Commission denied by its order issued September 27, 1960. On October 3, 1960, Tennessee filed its petition to review with this Court and simultaneously filed a motion for stay of the Commission's order. On October 28, 1960, this Court, with one Judge dissenting, denied the motion for stay.
 
 
 11
 Although Tennessee summarizes its extended specifications of error by placing them in five numbered paragraphs,[1] we discuss them under two headings:
 
 
 12
 (1) The rate of 6 1/8 percent was based on findings 'unsupported by substantial evidence and is unreasonably low.'
 
 
 13
 (2) The Commission erred in putting a rate less than 7 percent into effect by an interim order prior to determining whether the cost allocations between the six zones were lawful.
 
 
 14
 Considering first the 6 1/8 percnent rate, we find that the Commission had before it a full record disclosing sufficient economic factors to permit it to determine what was a just and reasonable return. Both Tennessee and the Commission recognize that the standard and principles to be observed in testing the correctness of the Commission's findings are to be found in the two cases: Bluefield Waterworks & Improvement Co. v. Public Service Commission of State of W. Virginia, 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176, and Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333.
 
 
 15
 The petitioner greatly stresses the following language from the Hope case:
 
 
 16
 '* * * the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. * * *'
 
 
 17
 Although the Commission does not counter by emphasizing any particular language of the opinion, we cannot overlook the following:
 
 
 18
 '* * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then importatn. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Cf. Railroad Commission (of Louisiana) v. Cumberland Tel. & T. Co., 212 U.S. 414 (29 S.Ct. 357, 53 L.Ed. 577); Lindheimer v. Illinois Bell Tel. Co., supra, (292 U.S. 151, at pages) 164, 169 (54 S.Ct. 658, at pages 663, 665, 78 L.Ed. 1182); Railroad Commission (of State of California) v. Pacific Gas & E. Co., 302 U.S. 388, 401 (58 S.Ct. 334, 341, 82 L.Ed. 319).' 320 U.S. 591, 602, 64 S.Ct. 281, 288.
 
 
 19
 In stressing the language, 'The return to equity owners should be commensurate with returns on investments in other enterprises having corresponding risks,' petitioner argues extensively from the tables showing average earnings of the ten major pipelines over an eight-year period ending with 1958 and for the 41 pipeline companies comprising the entire industry over a ten-year period ending in 1959. It also strongly emphasizes the fact that the 6 1/8 percent return will yield the lowest return on common stock equity for any of its years of operation.'
 
 
 20
 The weakness of this approach is twofold: (1) There is no basis for Tennessee's implied assumption that it or any of the pipeline companies are entitled to the same return on book equity which they have historically enjoyed. 'A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.' Bluefield Waterworks & Improvement Co. v. Public Service Commission, supra, at page 693, 43 S.Ct. at page 679. (2) The Commission found that petition was not an 'average' pipeline company but rather that it is one of the largest and soundest. It is thus a non sequitur for petitioner to argue that because the eight or nine year average return on common equity of a group of companies has been higher than 10.12 percent then that rate is not just and reasonable for Tennessee for 1960.
 
 
 21
 The Commission specifically stated that it did 'give consideration to the evidence of the return on book equity of Tennessee as compared to the other major pipeline companies as a factor in fixing a return which is commensurate with returns on investments of other enterprises having corresponding risks.' With the evidence touching on the returns on book equity of other major pipeline companies present in the record, we cannot find, as invited to do by petitioner, that this statement of the Commission is without foundation.
 
 
 22
 Petitioner strongly attacks the weight attributed by the Commission to the 'earnings-price' ratios of Tennessee as bearing on its competition for the investor dollar. We think it clear that the Commission used such comparison to test the degree to which the investing public considered the return to be 'commensurate' with other pipeline companies. Touching on this matter the Commission said, 'Such data indicate that Tennessee enjoys a favorable and improving position in the money market in relation to the rest of the industry.'
 
 
 23
 We have carefully analyzed the criticisms levelled by the petitioner on both the method used by it and its conclusions explaining its reason for adopting the 6 1/8 percent rate of return, and we find them to be without substance on the record before us. Moreover, we find no merit in the contention that the Commission erred, in the computation of Tennessee's capital structure, in failing to include as common equity capital the convertible preferred stock which was in the process of being converted into common stock and in failing to include in the capital structure mortgage bonds which had been issued by a Tennessee subsidiary. We consider the treatment given to these two items by the Commission as well within its discretionary powers.
 
 
 24
 We next come to the challenge of the Commission's applying the 6 1/8 percent rate of return to Tennessee's natural gas production properties before a determination was made as to whether a different rate of return was justified for these properties. The Commission answers this complaint in two ways. It says, first, that Tennessee did not distinguish, in its application for a 7 percent overall rate, between the rate of return it was entitled to receive on its production properties from the overall rate. We think this is not an adequate answer, because a larger return for production properties may well have been recovered under a 7 percent overall rate, whereas this might not be the case under a 6 1/8 percent overall rate if production properties were later found to be entitled to a higher rate of return. However, as to the second point urged by the Commission, we think it fully answers petitioner's contention. In allowing 6 1/8 percent rate of return, the Commission postponed for further consideration the treatment to be afforded substantial amounts received by petitioner through its treatment of federal income tax provisions for statutory depletion and intangible well-drilling costs. The Commission concluded that if Tennessee shows that it is entitled to a higher return on that part of its capital that is represented by production properties, this can be provided for when the Commission makes a final disposition of the treatment of the two tax benefits reserved for later consideration.
 
 
 25
 We nect come to the complaint that the Commission could not legally enter the interim order denying the 7 percent rate of return and inviting the filing of new schedules based upon a 6 1/8 percent rate so long as there remained unresolved the question whether the allocations of cost among the six zones of operation would ultimately be approved by the Commission.
 
 
 26
 A majority of the Court, with the writer of this opinion dissenting, concludes that the Commission could not legally effectuate its order requiring the 6 1/8 percent rate of return to be given effect until it had made its determination as to the proper allocation of cost of service among the several zones. The following part of the opinion, written by Judge WISDOM, and concurred in by Judge CAMERON, becomes the Court's opinion touching on this phase of the appeal:
 
 WISDOM, Circuit Judge:
 
 27
 On April 30, 1959, the another proceeding involving Tennessee, in Docket No. G-11980, the Commission issued an order stating:
 
 
 28
 'It is our view that separate and prior hearing on the issues relating to the principles and methods to be applied toward allocation of costs among the zones on Tennessee's system and among the classes of service within the zones will aid in the disposition of this proceeding and may be of similar aid in disposition of proceedings in Docket No. G-17166.'The Examiner in this proceeding rules that the cost allocation as determined in Docket No. G-11980 would govern the allocation of service in this case. The cost allocation issue is ready for decision.
 
 
 29
 What the Commission in 1959 considered a reasonable and orderly sequence of proceedings seems equally reasonable and orderly now.[3]
 
 
 30
 The Commission's refusal to decide the cost allocation issue means that thre is no basis for determining which of the filed rates in specific zones are unlawful, the extent to which individual rates should be reduced, or to whom refunds are due. Meanwhile, the effect of the interim order is to continue the alleged discriminatory differential in favor of Zones 1, 5, and 6, although the Columbia companies, operating in Zones 2, 3, and 4, for several years have been endeavoring to have the Commission determine a proper cost allocation among the zones. Tennessee will be injured, because it will not be able to recover adequate costs of services from the undercharged distributors in Zones 1, 5, and 6. For that matter, Tennessee would be injured if it were entitled to an overall return of 7 percent on its investment. It will be injured in any case because of the retroactive effect that will follow from the Commission's belated determination of cost allocation. This effect works in favor of Tennessee's overcharged customers, who are entitled to refunds, but works against Tennessee since it may not recoup from undercharged customers. Tennessee, therefore, will be unable to earn the return the Commission considers just and reasonable, no matter what that rate is.
 
 
 31
 It is true, of course, that the allocation of costs in all six schedules was made by Tennessee; that if these allocations are correct and are approved Tennessee will not be damaged; that the burden rests on the applicant to justify each rate increase. But conditions change, costs are not static, and rates are at best an educated guess. It seems that in filing rates a public utility should not be held, at its peril, to the requirement of foretelling the decision of the Commission on the correctness of the rates. The statute appears to have been designed on the assumption filed schedules will have to be adjusted. Lawful rates may be determined only after a full hearing; until the Commission fixes rates the utility is protected by being allowed to collect at the filed rate but under bond and subject to refund, and the consumer is protected by the refund of excess charges with 7 percent interest.
 
 
 32
 We question whether the hearing in which the cost allocation issues was excluded was the 'full hearing' contemplated in Section 4(e) of the Act. We question whether the order, issued after a hearing in which the issue of cost allocation was barred, is a lawful order. It seems too, that when the retroactive effect of the eventual determination of cost allocation makes it highly unlikely, if not impossible, for a utility to earn a 'just and reasonable return,' such an interim order lacks the weight and legal effect courts properly give to most orders of the Commission. Finally, regardless of the Commission's authority to issue the order, we hold that cost allocation among zones is such an essential element in determining whether the filed rates are excessive that it is unreasonable and an abuse of discretion to issue an interim rate order before deciding a pending allocation issue ripe for decision.
 
 
 33
 PER CURIAM.
 
 
 34
 The Court concludes that the manner in which the foregoing opinions can be given effect is to approve the order of the Commission as to all matters dealt with by it in the challenged order except its decision that the order was to become effective prior to a final determination of the allocation issue, and except the order requiring immediate refunds of the excessive rates collected under the suspended schedules. The order of the Commission is in these respects set aside. The case is remanded to the Commission for further proceedings not inconsistent with this opinion.
 
 
 35
 CAMERON, Circuit Judge, concurs in the result.
 
 
 36
 TUTTLE, Chief Judge (dissenting in part).
 
 
 37
 Although all members of the Court are in accord on the matters discussed in the main body of the opinion, I respectfully dissent from that part of the opinion that holds that the reduced rate of return cannot be legally effectuated by a Commission order until the Commission makes the determination of allocation of cost of service.
 
 
 38
 The significance of this issue is made apparent by the petition of the Columbia Companies. This petition asserts that these companies have consistently opposed the schedules filed by Tennessee to be effective in zones 2, 3 and 4, in which they operated because, so they alleged, Tennessee had allocated its cost of service unfairly against their interests and in favor of zones 1, 5 and 6. It is asserted that by reducing the rate to be chaerged by cutting from 7 percent to 6 1/8 percent the rate of return, this would increase the amount by which zones 1, 5 and 6 are underpaying their proper rates. It is clear that if the Commission should later determine that cost allocations improperly favored zones 1, 5 and 6, the customers in those zones would be benefitted to the extent that they had obtained the gas at the rate now approved by the Commissions' interim order. This follows from the structure of the statute which makes rate increases prospective only. In other words, there is no way in which Tennessee could hereafter, if we approve this 6 1/8 percent order, collect additional sums to make up for the advantage zones 1, 5 and 6 will have enjoyed because they were favored temporarily with a cost of service allocation improperly weighted in their favor.
 
 
 39
 Columbia's next contention, however, does not follow from this fact. Columbia claims to be prejudiced because it says zones 1, 5 and 6 may subsequently be found to have received gas too cheaply at Columbia's expense. It is true that it is possible that the Commission may find that zones 1, 5 and 6 have received gas too cheaply. The weakness of Columbia's position, however, is that Columbia is not, and cannot be, hurt by any such subsequent determination. This follows because the rates which Columbia is now paying are still being paid subject to a final determination as to their lawfulness as to all matters except the rate of returns on the common equity. Thus, it will be entitled to a refund of all amounts it may be found to have paid in excess of the correct rate because of an improper allocation of costs of service. Columbia is now immediately benefitted to the extent that it is paying, subject to refund, on schedules including a 6 1/8 percent rather than a 7 percent rate of return. It is not an aggrieved party merely because the Commission did not proceed to a final determination of other possible savings to it at the same time.
 
 
 40
 The Columbia companies strongly argue that they are entitled under the statute, as an interested party, to a determination by the Commission of their complaint of undue preferences granted to the other zones in violation of Section 4(b) of the Natural Gas Act. They are undoubtedly entitled to such a determination, but not necessarily before the Commission can eliminate what it finds to be an unlawful increment in the price structure. See State Corporation Comm. of Kansas v. ,F.P.C., 8 Cir., 206 F.2d 690, certiorari denied 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416, Columbia could be hurt in these circumstances only if Tennessee were to be permitted to withhold refunds to which Columbia might become entitled on the ground that it coul dnot recoup from zones 1, 5 and 6, and, therefore, it could not be required to refund excessive charges from zones 2, 3 and 4. As I will next show, this is not the law.
 
 
 41
 Tennessee claims that there is nothing in the Natural Gas Act that warrants the entry of an order that has the effect of reducing the charges it can make until the Commission decides whether it may not be charging too little from three zones even though it may be charging too much in three others.
 
 
 42
 The Commission answers this in two ways: (1) the allocation of costs in all six schedules was made by Tennessee. If these allocations are correct and are approved Tennessee will not be damaged. If they are incorrect they will be corrected and Tennessee will be required to make additional refunds to customers in those zones that were unfairly burdened by the improper allocations, but it will be unable to collect for any increased rates as such that a correct allocation would have warranted from the customers in the zones where there was an unfairly low increment of cost of service. This, the Commission says, is only the natural result of the regulatory scheme envisaged by the Natural Gas Act. The burden rests on the applicant to justify each rate increase. This includes the burden to establish the correctness of the allocation of costs of service as to each schedule filed. Tennessee stands in no different position than if the Commission, after the section 4 hearing, decided that Tennessee was entitled to an overall return of 7 percent on its investment, just as asked for by Tennessee, but decided that the cost allocations between the several zones were discriminatory, as here claimed by Columbia. The Commission would not have the authority to increase the schedules filed by Tennessee in zones 1, 5 and 6, but it would be under the obligation to reduce those for 2, 3 and 4 and make refunds for excess amounts paid by Columbia. See Interstate Power Co. v. Federal Power Comm., 8 Cir., 236 F.2d 372. In such a situation Tennessee would not realize the full permitted rate of return because it would have failed to substantiate the correctness of the cost allocation. Of course, the Commission could, and should under such circumstances, authorize the filing of new schedules to have prospective effect to remedy the allocation imbalance, but it would have no power to authorize Tennessee to collect more from zones 1, 5 and 6 than its filed schedules called for. (2) The Commission has a second answer to Tennessee's criticism in this regard. It seems to say that Tennessee still has several unresolved rate increases pending, all of which affect these same zones, and, if Tennessee is found to have undercharged zones 1, 5 and 6, it may have ample funds collected under bond subject to refund to customers in these zones from which it can recoup for a failure to charge the permissible rate for the period of this present rate proceeding. I think we need not speculate on this matter because I think the first contention elaborated above is sound.
 
 
 43
 I would affirm the Commission's order in full.
 
 
 44
 Rehearing denied; TUTTLE, C.J., dissenting.
 
 
 
 [1]
 This summary is as follows:
 '1. The Commission erred in allowing Tennessee an over-all rate of return only 6 1/8 percent. Such rate of return is confiscatory, deprives Tennessee of property without due process of law in contravention of the Fifth Amendment of the Constitution of the United States, and constitution of the United States, and capricious action against Tennessee.
 
 
 [2]
 The 6 1/8 percent rate of return is based on finding unsupported by substantial evidence and is unreasonably low in that:
 a. It fails to yield a return on common book equity commensurate with returns being earned by enterprises having corresponding risks.
 b. It is unjustifiably less than the rate of return allowed by the Commission in its most recent decisions to pipeline companies having a more secure capital structure than Tennessee.
 c. It fails to provide the margin of safety over the cost of debt necessary to prevent the quality of Tennessee's senior securities from deteriorating and being downgraded.
 
 
 [3]
 The Commission arbitrarily required Tennessee to reduce the rate of return on its natural gas production properties even though the Commission set for further hearing the issue of the rate of return to be allowed on such properties
 
 
 [4]
 The Commission erred in the computation of Tennessee's capital structure in failing to include as common equity capital the convertible preferred stock which was in the process of being converted into common stock, and in failing to include in the capital structure mortgage bonds which had been issued by a Tennessee subsidiary
 
 
 [5]
 The Commission illegally and arbitrarily set aside Tennessee's rates without deciding the cost allocation issue, which decision was necessary in order for the Commission to determine which, and to what extent, the individual zone rates filed by Tennessee were unlawful.'
 
 
 [2]
 It is not disputed that the 7 percent overall return sought by Tennessee would have provided a 12.70% return on the book value of Tennessee's common equity capital or that the 6 1/8 percent overall return would provide a 10.12 percent return on common equity
 
 
 [3]
 In Tennessee Gas Transmission Co., FPC Docket No. G-5259, the Commission issued an order holding that it would be 'premature,' 'unfair' and 'improper' to issue an interim order before determining pending allocation issues